WARREN C. GUNBY ET AL. *v.* LORIE C. QUINN, JR.
[No. 11, April Term, 1928.]

124

*Decided June 20th, 1928.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, J.J.

*Gordon Tull,* submitting on brief, for the appellants.

*Harry C. Dashiell,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

The appellee, Lorie C. Quinn, Jr., filed an application with the Commissioner of the Land Office for a survey and grant of certain land which he alleged to be vacant, lying and being in Somerset County, Maryland, and described as follows: "On the north by the waters of Big Annemessex River; on the east by the lands of Henry A. Zenke and the highlands and the head waters of Little Annemessex River to the mouth of a creek designated on the map of the U. S. Geodetic Survey as West Creek; on the south by the waters of said West Creek, to Tangier Sound; and on the west by the waters of Tangier Sound." In response thereto, a special warrant was issued out of the land office, directed to the county surveyor for Somerset county, who, at the time, was G. Holton Quinn, to survey the land mentioned in the application. A certificate and plat were made and returned by the surveyor to the land office; the land therein being described as follows:

"Beginning for the same on one of the lines of the old Gunby and Bell property on the shore of the Big Annemessix River at the point marked A on the plat and running thence by and with the said lines the following courses and distances: South forty-nine degrees west one hundred and seventeen rods, south forty-five degrees west one hundred and fourteen rods, south forty degrees east forty rods, south fifty-two degrees west one hundred and thirty-six rods, thence south fifty-four degrees east thirty-two rods, thence by and with the Tangier Sound the following courses and distances: South thirty-nine degrees east twenty-two rods, south seven degrees east thirty-two rods, south nine degrees west thirty-six rods, south eight degrees west twenty-two and one-half rods, south thirty degrees west thirty-eight rods, south eighty-five degrees east seven rods, thence across the marsh the following courses and distances: South forty-two degrees east one hundred and sixty rods, south one degree west three hundred and twenty rods to the mouth of West Creek, thence north twenty-nine degrees and thirty minutes east sixty rods, north twenty-one degrees east seven hundred and

ten rods, north six degrees east one hundred and seventy rods to a point on the shore of the Big Annemessix River, thence by and with the said river the following courses and distances: North sixty-one degrees west forty-one rods, north sixty-nine degrees west thirty-three rods, north eighty-six degrees west twenty-four rods, south eighty-nine degrees west twenty-seven rods, north sixty-four degrees west ten rods to the place of beginning. Containing and now laid out for five hundred and twenty-four and sixty-four one-hundredth acres, more or less. To be held by the name of 'Somerset Beach'."

The surveyor, however, stated in his return that "this survey goes around but does not include a tract of land patented under the name of Flat Capp which contains fifty acres."

The appellants in due season filed their caveat to the issuance of a patent to the appellee for the tract so surveyed for him containing 524 acres, for the reasons: (1st) that "all the land or most of it, covered by the survey of 'Somerset Beach' * * * has been already granted by the State of Maryland to different people who are now dead but who left heirs; that the greatest part of said land is included in the following patents: Patent to Thomas and Ambrose Dixon 1,200 acres called 'Dixon's Lott" granted December, 1695; (2nd) patent of 'Mistake' granted to Martha Jones for 400 acres, May 20th, 1705; (3rd) patent to 'Flat Capp' for 50 acres granted to Thomas Jones, November 10th, 1695; and none of this land has ever escheated to the State." The petitioners then alleged that all the land contained in the patents for "Mistake" and "Flat Capp" and 150 acres of land called "Dixon's Lott" has become the property of the caveators and therein alleged how it had so become their property.

Their caveat further alleges:

"That the said caveators and those under whom they claim, in addition to their paper title as above mentioned, are now in possession of said land described in said patents and included in the certificates hereby

caveated, and for a long time, so long that the mind of man runneth not to the contrary, for hundreds of years, have been in open, exclusive, continuous and uninterrupted possession of all the said land mentioned as 'Mistake,' 'Flat Capp' and part of 'Dixon's Lott' and for a long time paid taxes on it, and they have held the same open and notoriously without their title ever being questioned, it being generally understood all this time by all the people that the said tracts of land belonged to the said Gunby family, giving the said Gunbys a prescriptive title to the said land in addition to the above-mentioned paper title."

In the plat returned by the surveyor he fails to locate adjoining tracts, or to indicate the location of the creeks, coves, etc., that are mentioned in the proceedings, but gives simply the courses and outlines of the land surveyed. We will, therefore, ask the reporter to insert in this case, for illustration, the plat, known in these proceedings as Caveator's Exhibit A, made by Levin H. Hall, on which the locations and names of such creeks, coves, etc., appear, and upon which he has placed the outlines of the lands contained in "Somerset Beach" as returned by G. Holton Quinn, surveyor.

The land contained in "Mistake," is described as being on the south side and at the mouth of the Annemessex River, and is bounded as follows:

"Beginning at the mouth and northermost side of a creek issuing out of the bay or sound called Rock Hole Creek, thence along and with the said bay or sound north thirty-nine degrees westerly seventy-two perches, thence north seventeen degrees and a half westerly ninety perches, thence north twenty-five degrees westerly twenty-four perches, thence north fourteen degrees easterly eighty-two perches, thence north thirty-two degrees easterly seventy-four perches, thence north seventy-two degrees easterly sixty-eight perches to the west point, thence south seventy-seven degrees easterly forty-two perches, thence north eighty-five degrees easterly seventy-six perches, thence north sixty-five easterly sixty-eight perches, thence south eighty-

five degrees easterly one hundred and forty-eight perches to the westernmost side and mouth of a creek issuing out of Annemessex River called Sandy Point Creek, thence with a line drawn south forty-nine degrees westerly two hundred fifty-four perches, thence south forty degrees easterly forty perches and from thence with a right line drawn to the first bounder. Containing four hundred acres, more or less."

It will be seen that the beginning line of "Mistake" is located at the mouth and northernmost side of Rock Hole Creek, from which point it follows the shore line of Tangier Sound to the westernmost side and mouth of a creek issuing out of Annemessex River, called Sandy Point Creek, thence with the four given courses and distances to the place of beginning. It is shown from the evidence that in the lapse of time between the date of the patent and the time in which the survey was made under the warrant, the shore line of this tract of land had greatly washed and the mouths of Rock Hole Creek and Sandy Point Creek had changed, the evidence being that Rock Hole Creek on the sound was much further to the north than formerly, while the mouth of Sandy Point Creek on the river side had undergone far less change in location. With the washing of the shore the courses and distances naturally changed and the distance following the shore line between said points was much lessened.

As was said by the Commissioner of the Land Office in his opinion in this case: "The original patent reaches from Rock Hole Creek to Sandy Point Creek in 10 courses, covering a distance of 744 perches, while the present survey covers the same shore line in 14 courses covering a distance of 720 perches, a difference of 24 perches. This in itself is negligible when comparison is made with the modern instruments of today in measuring as against the usual cut pole that was stepped off to represent a perch in the earlier period of the settlement of Maryland." Though the courses and distances vary from those in the original patent, the calls for the mouths of Rock Hole and Sandy Point Creeks will control.

*Heck v. Remka,* 47 Md. 68; *Whilridge v. Baltimore,* 103 Md. 412; *Hill v. McConnell,* 106 Md. 574; *Stewart v. May,* 111 Md. 162. And the surveyor was wrong in ignoring the call at the mouth of Sandy Point Creek, by stopping at a point one half mile therefrom, and from thence running the four last courses to the place of beginning. As held by the commissioner, the four last lines of "Mistake" should have started at the mouth of Sandy Point Creek and not at the point mentioned in the survey under the warrant.

In reaching a decision as to Flat Capp, we have more difficulty because of the uncertainty of its location. It is described in the patent, as being "all that tract or parcel of land called Flat Capp lying in Somerset County on the South Point and near the mouth of Annemessex River bounded as follows: Beginning at a marked cedar standing on the southwest side of a hammock of cedars called Flat Capp thence for length including another small hammock east by north two hundred perches thence north forty degrees westerly forty-five perches thence west by south two hundred perches and from thence with a right line drawn to the first bounder. Containing and now laid out for fifty acres of land."

It will be seen from this description that the starting point began at a marked cedar standing on the southwest side of a hammock of cedars called Flat Capp. Neither the cedar nor the hammock of cedars near where it stood can any longer be located and hence the difficulty in locating Flat Capp. It is conceded, however, that it lies to the south or southeast of "Mistake" and north of Dixon's Ditch, which starts at or near the mouth of Flat Capp Creek and runs southeast to the head waters of Cedar Creek, which flows into the Little Annemessex River, and is wholly within the lines of the caveatee's survey.

It is claimed by the caveators that the fifty acres of "Flat Capp" is located between Rock Hole Creek and Flat Capp Creek, while it is contended by the caveatee that its proper location is near the Annemessex River, and the county surveyor, without any sufficient reason therefor, as it appears

to us, has located the same in his survey near the Annemessex River, partially within the lines of "Mistake," as decided by the commissioner and within and surrounded by the lines of the survey, in conformity with the claim of the caveatee.

The caveators claim the land embraced within "Mistake" and "Flat Capp" under their record title, derived from the patents therefor. The title to the balance of the land, contained within the lines of the caveatee's survey, lying north of Flat Capp Creek, Dixon's Ditch, and Cedar Creek, is claimed by them by adverse possession. This claim to such land is, we think, sufficiently supported by the evidence.

The whole of the land involved is marsh land used for the purpose of trapping, gunning and pasturing, and so far as the record discloses, no person has ever made his permanent home thereon.

In determining the sufficiency of evidence to support the claim of adverse possession, consideration should be given to the nature and character of the land and the uses to which it can be applied, or to which the claimant may wish to apply it. Evidence that would be sufficient in respect to swamp and marsh land, used only for pasturing, hunting, and trapping, might be wholly insufficient in cases of enclosed and cultivated land. Or, as stated in *Sadtler v. Peabody Heights Co.,* 66 Md. 6. "In determining the question, whether one has an actual possession of property, we must take into consideration its character and locality, and the uses and purposes, for which it is naturally adapted, for the possessory acts over an outlying and uncultivated piece of land, may be proved by acts of ownership somewhat different from what will be required in regard to land under inclosure and in actual cultivation." *Bloodsworth v. Murray,* 138 Md. 645.

The evidence in support of the caveators' claim of adverse possession was that the lands so claimed had always, within the memory of the oldest residents of that community, been known as the lands of the caveators, or those from whom they claim, and that said lands had been used, for trapping,

hunting, and pasturing cattle, either by them, or those to whom they rented or granted the privilege of using it.

As to the location and extent of the lands so claimed by adverse possession, John W. Landon testified that, on an occasion when he went to see Dr. Gunby to obtain permission to build a shanty near Tangier Sound between Flat Capp Creek and Rock Hole Creek, he was told by Dr. Gunby that the Gunbys were the owners of all the land north of Dixon's Ditch running to the head of Sand Bar Creek (Sandy Point Creek) to a place called the Cedars on the sound shore, and that Dixon's Ditch was the southwest boundary of the Gunby land.

John W. Colbourn, aged seventy-five years, testified that when a boy he attended his father's cattle, which were pastured at times upon Flat Capp, and he was then told by his father that the Gunbys owned this land and that he obtained permission from them to pasture his cattle thereon. That in doing so he drove the cattle down to Dixon's Ditch and over a bridge crossing it, and, to prevent them from re-crossing the ditch to the lands south of it, he would pull up the logs of the bridge. It was also testified to by one John Somers, aged seventy-five years, a farmer of Lawson's District, that he was told by his father that the lands north of Dixon's Ditch, known as Flat Capp, belonged to the Gunbys, and Frank Daugherty also testified to the same effect.

Alonza Charnick, a waterman, testified that he, at times, would go with his grandfather on the marsh in question, crabbing and picking up oysters to take home. On one or more or these occasions he was told by his grandfather that the marsh belonged to the Gunby heirs. He had heard other people say the same thing. About nineteen or twenty years prior to his testifying he and others decided to set fish traps on the Sound shore and they wanted a place "to stay out of the weather." Mr. Thomas Landon, a very old man, one of the party, obtained permission from Dr. Gunby to build the shack on the marsh between Rock Hole Creek and Flat Capp Creek, about thirty or forty yards from the shore line on Tangier Sound. The shanty was built at the place stated

and rent was paid therefor to the Gunby heirs. Others testified that they too built shanties thereon and paid rent therefor to the caveators. It is true that at the time these shacks were built it was less than twenty years prior to the institution of these proceedings, nevertheless the lands were then, and had been for a long time prior thereto, known as the Gunby lands, and were generally recognized as their property, and it was because of that knowledge and general recognition of their ownership that the permission of the Gunbys was sought and obtained. In addition to this the evidence discloses other acts of the caveators, long prior thereto, by which they received the right of ownership to these lands, such as hunting, trapping and pasturing their cattle thereon and renting and granting to others the permission to so use them. In view of these facts, we are of the opinion that the caveators have sufficiently supported their claim of adverse possession to entitle them to the lands claimed thereby, considering the character and nature of such lands.

There was some evidence offered to the effect that at times persons went upon the land trapping and hunting without obtaining the permission of the caveators, but, as said by Judge Urner, speaking for the court in *Gore v. Todd,* 150 Md. 290, "such incursions were not committed in the assertion or denial of any title." Some of the testimony in the record was improperly admitted, but there is, however, sufficient competent proof to sustain the appellants' claim of adverse possession to said land not subject to the record title.

In our opinion no land contained in the survey under the warrant, lying to the northward of Dixon's Ditch, should be granted to the caveatee, under the application here made.

The decision of the commissioner, as we understand it, was that the survey should be corrected so as to make it conform with the original lines of the patent of "Mistake," that is, that its fourteenth course should start at the mouth of Sandy Point Creek on the Annemessex River, the effect of which was a refusal to grant to the caveatee the land lying between the four last courses of the patent and the four last courses

of the survey under the warrant, but held that all the balance of the land within the survey north of Dixon's Ditch, including the whole of "Flat Capp," wherever there located, should be granted to him. In so holding, the commissioner, we think, erred, as, in our opinion, no land north of Dixon's Ditch should be granted under the application made.

To this extent we reverse the order appealed from.

*Order reversed and the case remanded, that a patent may be issued in conformity with this opinion, the appellee to pay the costs.*