## GOEN ᴇᴛ ᴀʟ. *v.* SANSBURY

[No. 149, September Term, 1958.]

*Decided March 17, 1959.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ., and KEATING, JR., Associate Judge of the Second Judicial Circuit, specially assigned.

*William E. Brooke,* with whom were *Shriver & Brooke* on the brief, for appellants.

*T. Van Clagett, Jr.,* with whom was *M. Hampton Magruder* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

The appeal is from a decree dismissing a bill by landowners (the descendants of Otho S. Pumphrey and a spouse of one, hereinafter called "the Pumphreys") against an adjoining owner (Mrs. Sansbury) to remove a cloud on the title to a tract of ground claimed by both, after a finding by the chancellor that Mrs. Sansbury had acquired good title to the disputed area by adverse possession. Mrs. Sansbury claims in this Court that the chancellor's decision is supportable on the alternative theory that there was no basis for equitable relief shown since the Pumphreys did not have possession, citing cases such as *Carswell v. Swindell*, 102 Md. 636. The point was not raised below, does not present the issue of fundamental jurisdiction, and is not before us. Maryland Rule 885; Code 1957, Art. 16, Sec. 128; *Haldas v. Commissioners of Charlestown*, 207 Md. 255, 263; *Moore v. McAllister*, 216 Md. 497, 505, *et seq.*

Near Forestville in Prince George's County are two tracts of land which were once both owned by one Nathan Summers, who died in 1844. The High Court of Chancery of Maryland partitioned his land among his heirs. His daughters Louisa and Ann, in 1855, deeded to one Angell what is now the land of the Pumphreys, including the portion in controversy. From Angell the land came by mesne conveyances to Otho S. Pumphrey in 1923 and, at his death, passed to the appellants. From 1844 on, the Pumphreys showed a clear chain of title. The tract of land owned by Mrs. Sansbury, the respondent below, first appeared in her chain of title in 1867, when the administrator of one Albert Berry conveyed the tract—some forty-seven acres—to one Grafton Suit. No one has been able to locate of record any grantor of Berry or of his administrator. Recorded in 1896 (almost thirty years after Berry's death) were two contracts of sale, wherein Berry was vendee and Louisa Summers vendor, dated November 16, 1844, and July 12, 1849, which described the land remaining in Louisa Summers after her conveyance to Angell. The descriptions in the contracts do not conflict with those in the deeds to Angell and to the Pumphreys, although the de-

scription in the 1867 deed does, in that it purports to convey some of the land, including that in dispute, conveyed earlier by Louisa Summers to Angell. The expert title witness for the Pumphreys said he found no evidence of title in Berry or his administrators, other than the contracts of sale recorded years later, which did not cover the land in dispute.

When the 1867 deed from Berry's administrator was recorded, there was also recorded a plat prepared by the county surveyor which reflected the descriptions in that deed. Mrs. Sansbury acquired the Grafton Suit property in 1909. In 1924 she caused to be made and recorded a plat preparatory to offering lots for sale in a sub-division she called Sansbury Park and, in 1925, had recorded a similar plat which sub-divided the back lots—those in and near the area in dispute—into smaller lots. The outlines of these plats corresponded to those of the 1867 plat. In 1954, in an effort definitely to establish her line, Mrs. Sansbury employed another surveyor. He found the crucial lines to overlap the Pumphreys' property but by less, than the lines of the earlier plats. In 1938 the Pumphreys sub-divided their land in order to sell lots in a development they called Old Longfield. Their surveyor also found a conflict or overlap in the lines of the two properties; and the plat he made and recorded did not sub-divide the area in controversy, although the outer lines of the whole Pumphrey property as shown on the plat were those called for by the deed to Otho S. Pumphrey. A surveyor produced at the trial by the Pumphreys testified that his work in the field led him to the conclusions, illustrated by a plat he introduced in evidence, that the 1867, 1924 and 1925 plats of the Sansbury property showed a triangular encroachment into the Pumphrey property, varying from nothing at the apex to a length of 325 feet at the base (an area of 5.78 acres), and that the 1954 plat showed a similarly shaped encroachment 297 feet long at its base (an area of some 5 acres).

The evidence Mrs. Sansbury offered in support of her claim to the pie-shaped area by adverse possession was that sometime between 1909 and 1924 her husband had built a half-mile racetrack close to the disputed area, on which he

had conducted trotting races several times a year and that the back land (where the controversial triangle was) had been used for stables and the breeding of horses. It was not shown with particularity that the critical area was actually used for any purpose. In 1924 a sale of lots in the front part of the property was held. There was extensive advertising and a public auction attended by several hundred people, at which some one hundred lots were sold. In 1925 after the back land had been re-platted into smaller lots, a similar sale was held. There was testimony by Mrs. Sansbury and her son that trees were cut down inside the lines of the streets shown on the plat and that these indicated streets ran to the edge of the property claimed by the Sansburys. The lots were staked out; however, the auction of them in 1925 was not well attended, the prices offered were low, and the auction was called off and the offers to sell withdrawn. There is no evidence in the record of any other acts in connection with, or conduct in relation to, the disputed area from 1925 until 1938, other than the paying of taxes. Both the Sansburys and the Pumphreys paid taxes on the triangle in controversy.

In 1938, when the Pumphreys were in the process of subdividing their land, one of Mrs. Sansbury's sons advised the surveyor that he apparently was over their line. As a result, discussion was had and the Sansburys' and the Pumphreys' representatives went to the land records in Upper Marlboro in an effort to establish the true line, but they were unable to resolve the problem. The Pumphreys recorded their 1938 plat, on which the surveyor had put his certification that "this sub-division" did not conflict with "any other sub-division heretofore made and recorded * * *" (a statement which might be said to be literally true since the sub-divided part of the entire tract did not, although some boundary lines did). Mrs. Sansbury did nothing further with regard to the pie-shaped area until 1954, when she ordered the survey. As a result of that survey, markers were placed on the lines then run. Mrs. Sansbury never lived on any part of her land. Neither the Pumphreys nor Mrs. Sansbury personally occu-

pied the area in controversy nor sold lots out of it, although both sold lots out of other parts of their respective holdings.

The principles of law that control the case are well established. The Pumphreys showed a valid record title to the area in controversy and that they were in actual possession of a part of the whole land described in their deed. Mrs. Sansbury showed but color of title. Generally, one who has color of title, like one who has actual title, has constructive possession of the land within the outlines of his title, although he actually occupies only a part of it. However, one who enters upon the land of another, though under color of title, gives no notice to that other of any claim, except to the extent of his actual occupancy. Thus, if a true owner be in actual possession of part of the whole land to which he has record title, he is in constructive possession of all of the land which is not actually possessed by another who claims through color of title, and this although the owner's actual possession is not within the limits of the land claimed by the other. This result has been reached by the cases because both parties cannot be seised at the same time of the same land under different titles and the law adjudges, therefore, the seisin of all that is not in the actual occupancy of the adverse party to him who has the better title.

In *Hines v. Symington,* 137 Md. 441, 446, it was said: "This Court has decided that the possession of part of a tract of land by the rightful owner is constructive possession of the whole, as against one in possession of a part and claiming the whole under color of title, except as to the part actually occupied by the claimant." The statement was based on the decision in *Schlossnagle v. Kolb,* 97 Md. 285, 292. There the Court said: "In this kind of mixed constructive possession the legal seisin is according to the title. Title draws possession to the owner", and then adopted from 3 *Washburn on Real Property,* Sec. 1986, the statement that "* * * as against the owner in occupation adverse possession under color of title is of no avail as a foundation of title. This is true even if the owner go into occupation of a part of his land after the disseisin has commenced. The running of the statute will thereby be stopped as to so much of the land as was constructively

possessed and will be restricted to that in actual possession." See also *Hunnicutt v. Peyton*, 102 U. S. 333, 26 L. Ed. 113.

The chancellor found that the Pumphreys had the burden of proof and had not met the burden, and that Mrs. Sansbury "had opened up the property and had all the outward and open attributes of adverse possession actually for a period of more than twenty years." Once the Pumphreys had established a valid title of record and possession of a part of their land and the encroachment of the Sansburys, the burden of proving title by adverse possession shifted to Mrs. Sansbury. *Sachs & Sons v. Ward*, 182 Md. 385, 389. We think that the burden was not met. To establish adverse possession, a claimant must show that the possession was actual, open, notorious, exclusive and continuous or uninterrupted for the statutory period of twenty years. *Bishop v. Stackus*, 206 Md. 493, 498; *Peper v. Traeger*, 152 Md. 174, 181. It is conceded that the racetrack was not itself on the pie-shaped area, and the evidence as to the use of that area for stables and the breeding of horses was inconclusive. It may be assumed that the recording of the plats in 1924 and 1925 and the extensively advertised ownership of lots in the disputed area and their offering for sale at public auction, after the cutting of streets and the staking of lots, would constitute an ouster of the seisin of the Pumphreys, and that all of the elements of adverse possession would be present except that of continuity. Compare *Guaranty Title & Trust Corp. v. United States*, 264 U. S. 200, 68 L. Ed. 636, where similar activities by the intruder continued for the requisite period. There is no evidence that from 1925 to 1954 Mrs. Sansbury did anything in connection with or in relation to the disputed land except to pay taxes, and, in 1938, to tell the representatives of the Pumphreys that she believed her boundary line to be where her deed and the earlier plats had shown it to be. The present suit was brought within twenty years of 1938. The record indicates that from 1925 to 1938, and from 1938 to 1954, none of the Sansburys even went on the disputed area, and there is no doubt that after 1925 it grew up in brush and that it was a completely wooded area at the time of the trial and had been for many years before.

It is true that in determining whether there has been actual possession of property, there must be considered its character and locality, and the uses and purposes for which it is naturally adapted, since possessory acts of an outlying and uncultivated piece of land may be proved by acts of ownership somewhat different from those required with regard to land under enclosure and actual cultivation. *Bloodsworth v. Murray,* 138 Md. 631, 645; *Gunby v. Quinn,* 156 Md. 123, 130. Compare *Gore v. Hall,* 206 Md. 485, where it was noted that in order to establish adverse possession of unenclosed timber land, the evidence of cutting and hauling timber therefrom is not of itself sufficient because such acts might be nothing more than successive trespasses. But, here there were no acts of ownership for years after 1925 save the payment of taxes.

The decision to call off the sale of 1925, followed by a period of many years of complete inactivity as to the disputed area, permits a finding of no more than that Mrs. Sansbury believed she owned the land and claimed it, without giving any visible or open signs of that belief and claim. This, we think, shows abandonment or cessation of actual possession which restored the seisin and constructive possession of the Pumphreys, as holders of the older and better title, in actual possession of part of their tract. "And neither a record claim of title nor payment of taxes, without open, visible acts of possession, will suffice to support title by adverse possession." *Stinchcomb v. Mortgage Co.,* 171 Md. 317, 325 (the decision said also that a fence relied on to show enclosure of the area claimed would not suffice because the "evidence fails to show that it was standing for twenty years"). See also 4 Tiffany, *Law of Real Property,* 3rd Ed., Secs. 1145 and 1162. The latter section says: "Since the statute runs against the rightful owner only if there is an actual possession of the land by another, it ceases to run upon a cessation of such actual possession, an interruption of the continuity of possession, as it is frequently termed. If such an interruption occurs, and possession is thereafter resumed, the limitation period commences to run only from the time of such resumption. Dif-

ferent and distinct periods of possession cannot be added to-
gether to constitute possession for the statutory period."
In agreement are 3 *American Law of Property,* Sec. 15.9 and
2 C. J. S., *Adverse Possession,* Secs. 125-126. In *Arm-
strong v. Risteau,* 5 Md. 256, 275, the Court adopted the
language of *Casey v. Inloes,* 1 Gill 430, 496, saying: "* * *
that the title of the rightful owner, in a case of mixed posses-
sion, cannot be barred by adding together the different pos-
sessions and acts of the defendant, at long intervals, in point
of time, so as to make out twenty years, is a principle also
well settled. Upon every discontinuance of the possession of
the wrongdoer, by operation of law, the possession of the
rightful owner is restored, and nothing short of actual, ad-
verse and continuous possession for twenty years can destroy
his rights, or vest a title in the wrong-doer." The principle
was re-affirmed in *Gore v. Hall, supra,* at page 491 of 206 Md.

*Parrish v. Foreman-Blades Lumber Co.* (4th Cir.), 217 F.
335, succinctly restated the rules that the holder of the older
and better title has constructive possession of all his land;
and the holder of the junior and inferior title that overlaps
it must, if he is to acquire good title, enter upon and actually
hold adversely and continuously for the requisite period the
actual boundary claimed by the older and better title; and that
it is not enough that he enters into possession of land with-
in his paper color of title which is outside the lines of the land
in dispute. The case set forth the rule that the burden is on
the claimant by adverse possession to show every element of
it, and then said: "In case, too, the claimant under color of
title does take possession and hold for a time adversely, but
vacates before the statutory period expires, that moment the
owner, by reason of his legal title, will be regarded as in the
constructive possession and the adverse possession of the
wrongdoer at an end."

We think the principles we have discussed are controlling
and find that Mrs. Sansbury did not establish that her pos-
session ever was continuous for the requisite length of time.
There was a thirteen-year gap from 1925 to 1938, and, if it
be assumed that the 1938 conversation about the boundary

line started the statute running again, this suit to quiet title was brought within twenty years of 1938.

> *Decree reversed, with costs, and case remanded for further proceedings not inconsistent with this opinion.*