**UNITED STATES of America**

v.

**William A. GALLAS.**

**Civ. A. No. 17050.**

United States District Court
D. Maryland.
May 29, 1967.

---

142

Thomas J. Kenney, U. S. Atty., and Theodore R. McKeldin, Jr., Asst. U. S. Atty., Baltimore, Md., and James E. Clubb, Lands Division, Department of Justice, Washington, D. C., for plaintiff.

C. Rider Brandau, Jr., and J. Francis Ford, Baltimore, Md., for defendant.

NORTHROP, District Judge.

The United States has brought a civil action titled a Complaint in Ejectment in which it seeks legal and equitable relief from the alleged encroachment by the defendant on a thirty-five foot wide easement owned by the government. Jurisdiction is invoked under 28 U.S.C. § 1345 (1963). The easement in question was conveyed to the plaintiff in 1942 as part of the route for a twenty-four inch water pipeline installed in Harford County, Maryland, to service the armed forces installation at the Edgewood Arsenal. The plaintiff requests a declaration by the court that the defendant has no interest in the easement; an order that he remove his house from the easement; an injunction against any future interference; and an award of costs. The defendant in his answer admits that his house is over the pipeline but denies that he is encroaching on the easement owned by the plaintiff, contending that the pipeline does not run through the easement at all, but through other property.

The origins of this case are found in the land records of Harford County of some forty-eight years ago. On

February 3, 1919, T. Earl Hanson gave a mortgage to Robert Archer on a tract of about 79.82 acres of farm land, which he owned in fee. At some subsequent time Hanson sold a portion, 105 feet wide and 315 feet deep, in the southeast corner of the tract to Elmer P. Meredith, but no deed was ever recorded for this sale. Meredith then sold his land to Harry and Elizabeth Zeigler in another unrecorded transaction.

These events all occurred prior to March 4, 1921, for on that date a deed for the entire 79.82 acre tract was recorded in which T. Earl Hanson and his wife passed title to the property to John Delbo and his mother Margaret. The Zeigler land was inadvertently included in this sale. To clear up the confused state of the titles, a deed dated January 18, 1921, was recorded on March 22, 1922, in Liber D.G.W. No. 178, Folio 61 of the Harford County Land Records in which the Zeiglers were conveyed their previously purchased property by Meredith and his wife, the Delbos, T. Earl Hanson and Robert Archer.

The Delbos later suffered a foreclosure on the farm by Archer, and the latter sold the approximately 78 remaining acres of the tract to Jacob and Fenie Waltman in a deed recorded on April 25, 1923. This deed specifically excepted the Zeigler property in the following language:

"NOW THEREFORE IN CONSIDERATION of the premises and the sum of ten dollars ($10.00) the said Robert Archer, Attorney as aforesaid, does hereby grant, bargain and sell and convey unto the said Jacob P. Waltman and Fenie Waltman, his wife, the real estate reported as sold to the said Jacob P. Waltman, as aforesaid consisting of seventy eight (78) acres, more or less, situated in the First Election District of said County, and being all the real estate conveyed by said mortgage and also by said T. Earl Hanson to John Delbo and Margaret Delbo, by his deed dated 26th of February 1921 and of record

among said Land Records in Liber J.A.R. No. 173, folio 2, *except so much thereof conveyed by said John and Margaret Delbo to Harry Zeigler and wife by their deed of record among said Land Records in Liber D.G.W. No. 178, folio 61.*" [Emphasis added.]

The deed from Archer to the Waltmans was recorded in Liber D.G.W. No. 181, Folio 419 in the Land Records of Harford County.

The land records pertaining to the tract lay undisturbed for some years following this flurry of activity. Not until 1942 was another document recorded, and that is the deed at the eye of the present legal hurricane. A deed of easement was given by the Waltmans to the plaintiff United States dated November 27, 1942, and recorded in Liber G.C.B. No. 275, Folio 395 of the Harford County records. This was one of a number of easements acquired by the government to enable it to lay the Edgewood water pipeline. The deed from the Waltmans granted the plaintiff a permanent water pipe easement on a certain described portion of their land, giving the grantee the right to construct, operate, maintain, repair, patrol, and remove the pipeline. The description of the land covered by the easement is as follows:

"Beginning from the center line thereof at a point in the dividing line between the lands of the Grantor herein and the lands of Mary A. Norris and on the South line of a private lane said point being S 76° 37' W 797.4 feet from a post set in the Southeast corner of the property of the Grantor and proceeding thence N 6° 30' 10" W 257 feet; thence N 17° 38' 80" E 1302.5 feet; thence N 5° 38' 40" E 192.5 feet to a point in the dividing line between the lands of the Grantor herein and the lands of Sydney D. Peyerley, said point being S 77° 5' W 46.7 feet from a stake planted in the Northeast line of the Grantor's property, said easement being of a uniform width of 35 feet and containing approximately 1.4

Acres, more or less. BEING part of the land described in a deed dated April 21, 1923 from Robert Archer, Attorney, to Jacob P. Waltman and wife, and recorded among the Land Records of Harford County, Maryland, in Liber D.G.W., No. 181, Folio 419."

To bring the chain of title down to date requires mention of only two other transactions. By a deed dated September 30, 1950, and properly recorded the Waltmans conveyed about 14 acres in the south central area of their farm to Thomas E. Hanson and his wife. A confirmatory deed between these parties dated March 15, 1967, was later recorded covering the same property. Both of these deeds make reference to the 1942 easement acquired by the United States.

Finally, by a deed dated November 4, 1960, and properly recorded, the Hansons conveyed to William A. Gallas, the defendant, a one-acre portion of their property. The description in the deed of the land purchased by Gallas is as follows:

"Beginning for the same, at a point in the middle of Hanson Road, being in the North 6° 45′ West line of the whole tract, of which the land now being described is a part, which by Deed dated March 15th, 1957, and recorded among the Land Records of Harford County in Liber G.R.G. No. 478, Folio 158, was conveyed by Jacob P. Waltman and wife to Thomas E. Hanson and wife, and running thence, binding on the outline of said conveyance, North 6° 45′ West 25.00 feet to an iron pipe on the North side of said Road, thence still North 6° 45′ West 185.00 feet to an iron pipe, thence leaving the outline, and running for new dividing lines, through and across the land of the Grantors, South 81° 15′ West 210.00 feet to an iron pipe, thence South 6° 45′ East 185.00 feet to an iron pipe on the North side of the aforesaid Road, thence still South 6° 45′ East 25.00 feet to the middle of said Road, thence binding on the middle of said Road, as the

same is now paved and improved, North 81° 15′ East 210.00 feet to the beginning, containing One (1) acre, more or less, as surveyed by Glen C. Deaton, Registered Surveyor, October 5th, 1960;

"Being a part of the land conveyed by and described in a Confirmatory Deed from Jacob P. Waltman and Fenie Waltman, his wife, to the said Thomas E. Hanson and Helen E. Hanson, his wife, dated March 15th, 1957, and recorded among the Land Records of Harford County in Liber G.R.G. No. 478, Folio 158."

No mention of any easement was made in this document, although the acre Gallas bought, situated along the southern boundary and in the easterly half of the original Waltman tract, includes a part of the Waltman farm through which the easement passed.

Having purchased his one-acre plot, Gallas proceeded to build a house. On September 13, 1962, Gallas discovered that his almost completed home was square astride the Edgewood water pipeline. He stopped the construction activity at that time, and about three months later the Army Corps of Engineers required him either to move his house or to relocate the pipeline around it at his own expense. The defendant has pursued neither of these alternatives; the house still stands where it was built. The plaintiff has therefore brought this ejectment proceeding.

There is no doubt that the house cannot safely remain over the pipeline, and the parties have stipulated that if the easement is where the pipeline is in fact located, the plaintiff is entitled to the removal of the house as an encumbrance. The stipulation is supported by the testimony of James F. Lawrence, the Chief Facilities Engineer in this area for the Army Corps of Engineers. Mr. Lawrence testified that due to the shortages caused by World War II, the original pipe had been installed with material not ordinarily used. The substituted material makes the pipe more sensitive

to disturbances above it and more likely to rupture.

 This court is thus faced with a relatively simple question: Is the house situated on the easement acquired by the plaintiff in 1942 from Jacob and Fenie Waltman? If the answer is yes, then the house is an encumbrance and must be moved. If the answer is no— i. e., if the easement is located somewhere other than where the pipe is laid— then the defendant can leave his house where it now stands.[1]

The resolution of this question initially turns on the meaning of the words of description in the grant of easement from the Waltmans. The essential phrase in dispute is the first distance call, which reads

"Beginning from the center line thereof at a point in the dividing line between the lands of the Grantor herein and the lands of Mary A. Norris and on the South line of a private lane *said point being S 76° 37′ W 797.4 feet from a post set in the Southeast corner of the property of the Grantor.* * * *" [Emphasis added.]

The government has argued strenuously that this call should be read from a post which allegedly stood in the southeast corner of the original tract owned by Hanson in 1919 prior to the sale of the 105 foot strip to Meredith. The plaintiff has admitted that the post was in fact on property never owned by Waltman, but urges that that is of no matter, as the phrase "Southeast corner of the property of the Grantor" is merely descriptive of the general area in which the post could be found.[2] The plaintiff further informed the court that the post does not now exist, although no one is certain when it was removed. There seems to be little question, however, that there was a post erected at the ancient corner where four long-established farms met, i. e., the southeast corner of Hanson's 1919 estate. Following the reading recommended by the government would put the easement along the existing pipeline.

The defendant has argued with equal vigor to the contrary, claiming that the controlling monument for the call is the actual southeast corner of the 1942 Waltman tract, adjacent to the Zeigler property. He states that the reference to the corner is plain and unambiguous; that a post may or may not have been in that corner at one time; that a post

---

1. While in the past there has been considerable controversy over the power of a court of equity in Maryland to locate a right of way, it now seems settled that where confusion will be avoided and a multiplicity of suits forestalled, an equity court can so act. Fox v. Paul, 158 Md. 379, 148 A. 809, 68 A.L.R. 520 (1930). With the distinction between law and equity virtually abolished in the federal judicial system, Wright, Federal Courts § 67 (1963), this court feels it can properly grant whatever relief is required in this case, be it legal or equitable.

2. The government supports this stage of its argument with the case of Wilson v. Inloes, 6 Gill (Md.) 121 (1847). This is a lengthy and complicated decision exemplary of the great heritage of the law of property in Maryland. It involved, among other items, the location of a call from a then non-existent tree by the side of a branch, which call was one boundary line of the piece of property in litigation. The Court of Appeals of Maryland held on this point that the reference to the branch was merely descriptive of the general locality of the tree, not an imperative call locating a specific spot where the tree stood. The court noted that the tree could have occupied "any one of ten thousand different spots by the branch side. * * *" 6 Gill (Md.) at 152, and then followed the reverse course from a known monument at the other end of the boundary line to locate where the tree should have been.

The ruling in *Wilson* is not apposite to the present case. There is no dispute here over the placing of the now lost post. Rather, the court has been asked to choose between a post which apparently had stood in a corner not belonging to the grantor and a corner belonging to the grantor in which apparently no post stood. There never were ten thousand different corners in which the post might have been placed.

is a transitory structure at best; and that, in any case, the presence or absence of a post in the corner he claims should control is of no significance. Adopting the defendant's reading of the description places the easement 105 feet due west of the line the government has advocated and recognizes that while Gallas' house *is* on the pipeline, it *is not* on the easement.

■■ There are countless rules enunciated to guide courts in adjudicating disputes over descriptions and boundaries. See, e. g., Wood v. Hildebrand, 185 Md. 56, 42 A.2d 919 (1945); 12 Am.Jur.2d Boundaries §§ 64–76 (1964). Some pertinent ones are that the line of an adjacent tract, if known and established, can be a call in a deed as a natural monument, Dundalk Holding Co. v. Easter, 195 Md. 488, 73 A.2d 877 (1950); Wood v. Hildebrand, supra; Ramsay v. Butler, Purdum & Co., 148 Md. 438, 129 A. 650 (1925); Hill v. McConnell, 106 Md. 574, 68 A. 199 (1907); and that a natural monument prevails over an artificial monument if there is some conflict between the two, New York & T. Land Co. v. Votaw, 150 U.S. 24, 14 S.Ct. 1, 37 L.Ed. 983 (1893); 12 Am. Jur.2d Boundaries, op. cit. supra, § 68 and cases cited therein.

■■ If the court were to apply these principles to the present case, several conclusions would appear. The southeast corner of the grantor's property can properly be classed a natural monument, for it is formed by known and established boundary lines. A post, on the other hand, is an artifical monument erected by human hands. Tiffany, Real Property § 444 (2d ed. 1920). As noted above, were the post now standing, it would be 105 feet east of the true corner of the property Waltman owned in 1942, and the use of one monument would produce a different starting point for the easement than the use of the other monument. The rules stated in the cases direct that in this situation the natural monument, the corner, takes precedence.

■■ Unfortunately, this case cannot be decided merely by examining the appropriate rules for the interpretation of deeds. The basic premise for the application of these rules is the presence of some ambiguity in the wording of a description and the need to reconstruct a survey as best one can. Without a real possibility of varied interpretations, there is no need to consider the order of preference for monuments, etc., for the purpose of such directives is "simply [to] express the truth of common experience as to where error is most likely to occur", Wood v. Hildebrand, supra, 185 Md. at 60, 42 A.2d at 921.

■ The court agrees with the defendant that there is no ambiguity in the 1942 deed, and, hence, there is no need to bottom this opinion on the principles delineated. The terms of the easement referring to the southeast corner of Waltman's property are "obviously unambiguous" and should be given their "plain and ordinary meaning", Buckler v. Davis Sand & Gravel Corp., 221 Md. 532, 537, 158 A.2d 319 (1960). The only difficulty with the description is that there is no post in the corner where, according to the description, a post is supposed to be. This, however, is not unusual; posts, fences, and similar structures often disappear from the land for a variety of reasons. The corner as a monument cannot be disregarded simply because it does not now encompass a post.

The reference to the corner presents no problems of location. Waltman's property in 1942 was shaped like a large rectangle with the small rectangular Zeigler tract cut out of the southeast corner. Thus, there existed a southernmost southeast corner and an easternmost southeast corner of the Waltman farm, at the southwest and northeast corners, respectively, of the Zeigler tract. However, the easternmost southeast corner was 315 feet back from the private lane mentioned in the description and an equal distance from the dividing line between the Waltman farm and the

holdings of Mary A. Norris along which the measurement to the easement was to be made. The only southeast corner that the deed's description could meaningly refer to, as between the two corners noted, is the southernmost one.

■ There is no question in the court's mind that it would be totally unwarranted to read the first call as referring to the original southeast corner of the 1919 tract. The words of description must be taken to mean what they say, and where the deed speaks of the "Southeast corner of the property of the Grantor", it cannot be held reasonably to speak of a corner that the grantor *never owned*. Anyone reading the deed of easement from the Waltmans would have to assume that the reference to the corner was made with the knowledge of the Ziegler tract's existence. Any other assumption would be founded in ignorance.

The court therefore holds that the southernmost southeast corner of the Waltman tract of 1942 is the controlling monument for the location of the start of the easement. Measuring the stated distance of 797.4 feet from the corner along the dividing line between the Waltman and Norris farms, the beginning of the easement lies 105 feet west of the present location of the pipeline.

■ It should be noted that many of the cases dealing with problems similar to the one here have involved attempts by the courts to implement the intent of the parties to the original deeds.[3] Judge Horney of the Court of Appeals of Maryland set forth this approach succinctly in Buckler v. Davis Sand & Gravel Co., supra, at 537, 158 A.2d at 322:

"When an easement is acquired by an express grant, as was the case here,

the extent of the rights thereby granted must necessarily depend upon a proper construction of the conveyance or that part of it by which the easement was created. The primary rule for the construction of contracts generally—and the rule is applicable to the construction of a grant of an easement—is that a court should ascertain and give effect to the intention of the parties at the time the contract was made, if that be possible."

The application of this principle is well and good in the great number of cases wherein the opposing parties are the same as the parties to the original deed or grant. See, e. g., Burroughs v. Milligan, 199 Md. 78, 85 A.2d 775, 28 A.L.R. 2d 243 (1952), in addition to the Buckler, Wood and Dundalk Holding Co. cases previously cited. However, its utilization here would ignore the equities of the situation; we are dealing with a third party who knows nothing of the transaction but what he can learn from the documents on file in the county land records office. This is quite different from a disagreement between two subscribers to a deed—or their successors—about what they meant by the words they used in the instrument.

The more relevant law affecting this opinion can be found in the Maryland Recording Statute, art. 21, §§ 1–28, Ann. Code of Md. (1966), and the cases interpreting it. The origin of the present law is chapter 14 of the Acts of Assembly of 1766, Laws of Maryland, 1765–1784 (1787), 61 Archives of Maryland 233–35 (1944). This act was the first broadly inclusive recording statute in Maryland, amending an earlier provision to cover all conveyances of interests in land and establishing a system of court acknowl-

---

3. When there is latent ambiguity in a deed and the parties do not agree on an interpretation, the law has adopted the use of parol evidence and other external sources to discern the true intent of the drafters. Burroughs v. Milligan, infra; Clarke v. Lancaster's Lessee, 36 Md. 196 (1872); 25 Am.Jur.2d, Easements and Licenses § 23 (1966).

The court realizes that the intent of the government in 1942 was to acquire the strip of Waltman's land through which the pipe was ultimately laid. Waltman's intention was undoubtedly to convey to the government the land that it wanted.

edgment and alphabetical registration for freehold estates of a duration greater than seven years. The terms of the legislation are remarkably similar to the present law.

■ The Court of Appeals of Maryland stated the purpose of the 1766 statute in Hays v. Richardson, 1 Gill & J. (Md.) 366, at 384 (1829):

> "The language of its provisions comprehends the privilege attempted to be conferred by the instrument before us, and the policy of the law, the interests and convenience of the public, forbid that we should restrict its operation. In no other way can the leading object of the legislature, the 'securing the estates of purchasers' be effected; their design was, that all rights, incumbrances, or conveyances, touching, connected with, or in any wise concerning land, should appear upon the public records. If parol or unrecorded licenses of the character of that in controversy were tolerated, frauds and losses upon purchasers would be innumerable as may readily be imagined. A man might pay and receive a deed with all the solemnities of law, and covenants which could be devised (short of a general warranty which is rarely given) for a hundred acres or more of valuable meadow land, without the knowledge of the semblance of a right in any one by which its value could be imagined; on the next day he may learn that his purchase is a mockery; that his neighbour under an oral license, from some remote proprietor of the property purchased, (of which the vendor was ignorant) is about to inundate every foot of it by the erection of a mill-dam below, his remedy can no where be had."

See also United States Ins. Co. v. Shriver, 3 Md.Ch. 381 (1851); South Baltimore Harbor & Improvement Co., etc. v. Smith, 85 Md. 537, 543, 37 A. 27 (1897); and Tiffany, op. cit. supra, § 567. The present statute clearly has the same breadth and purpose as the law of 1766, Bourke v. Krick, 304 F.2d 501 (4th Cir. 1962), and applies to grants of easements, Nohowel v. Hall, 218 Md. 160, 146 A.2d 187 (1958); Mayor and City Council, etc. v. Brack, 175 Md. 615, 3 A.2d 471, 120 A.L.R. 543 (1939); Dawson v. Western Md. R. Co., 107 Md. 70, 93, 68 A. 301, 14 L.R.A.,N.S., 809 (1907).

■ Keeping in mind that the rationale of the recording statute is to alert purchasers of land to the interests of others in such land, the court turns again to the facts of this case. The government has readily admitted that its agents surveyed the properties over which the Edgewood pipeline ran, platted the path of the easement, examined the land records, and drew up the deeds of easement. Once the Waltman deed was signed and recorded, it served to give notice to any subsequent purchasers of the existence of the easement. Tiffany, op. cit. supra, § 567, at 2181. Thus, the defendant Gallas was chargeable with knowledge of the course of the pipeline as described in the 1942 deed.

However, as is evident from the analysis of the easement description set out above, the deed does not accurately inform the reader of the location of the pipeline. The government has argued that Gallas had notice of the entire contents of the deed and should have realized that the start of the easement could not be where the deed appears to place it. This realization comes, the plaintiff claims, from a platting of the easement across the full Waltman farm and the discovery that if the easement begins 105 feet west of the Waltman-Zeigler corner and the noted courses and distances are followed, it cannot end 46.7 feet southwest of a stake set in the northeast line of Waltman's land. The government concludes that the true course of the easement—one that follows the pipeline—should have been ascertained by running the course backwards.

■ The law fully supports the use of a reverse course to find the actual location of property described in an un-

clear manner. Newbold v. Condon, 104 Md. 100, 64 A. 356 (1906); Wilson v. Inloes, supra. When the description seems perfectly understandable, though, it would hardly be reasonable to require one reading the description to check its accuracy by plotting courses and distances backwards on a plat. Further, the starting point of the easement on the Waltman land is the only description concerning us here, for from that one description the defendant could locate the entire course of the government's easement through his property. The easement runs in a straight line past the back boundary of the Gallas tract, taking a turn to the northeast just beyond that boundary.

The court therefore cannot agree with the plaintiff that the defendant should have run a reverse survey in this case. Gallas can equitably be held to have done no more than locate the apparent path of the easement on his own property; there is rarely reason to ask the purchaser of one piece of land to determine the course of an easement through the lands of others. Without laying out the easement's complete path, the apparent incongruity would not appear, and since Gallas would never have had reason or purpose to do that, he would never have been aware of any error. The fact that Gallas claimed to be ignorant of the easement at all is of no matter, for we have been speaking in terms of constructive notice by recording.[4]

■■■■ To recapitulate, the court finds that the plaintiff must be held to the language its agents chose to use in drafting the Waltman grant. That language constructively notified the defend-

ant that the easement ran through his property on a different path than the pipeline actually followed. The error was apparently caused by ignorance of the Zeigler purchase on the part of the person drawing the deed; the government's agent must have thought Waltman owned the same tract Hanson possessed in 1919. In any event, the mistake was the plaintiff's, and the defendant cannot reasonably be required to have knowledge of it.[5]

■■■■ Two other legal questions remain to be considered. The government has attempted to convince the court that it has acquired the land through which the pipeline runs by a process of physical taking, under the law as enunciated in United States v. Dow, 357 U.S. 17, 78 S. Ct. 1039, 2 L.Ed.2d 1109 (1958). Mr. Justice Harlan, writing for the Court, noted in that case that the federal sovereign could take property by actual physical seizure, after which the owner would have to seek compensation under the Tucker Act, 28 U.S.C. §§ 1346(a) and 1491 (1963), 357 U.S. at 21, 78 S.Ct. 1039. However, Mr. Justice Harlan also stated, id. at 21–22, 78 S.Ct. at 1044,

"[I]n both classes of 'taking' cases— condemnation and physical seizure— title to the property passes to the Government only when the owner receives compensation, * * * or when the compensation is deposited into court * * *."

Neither of these events has occurred, so by the law of *Dow*, the government does not yet have title to the land from which it is seeking to eject the defendant. Without holding legal title, the plaintiff

4. Thomas E. Hanson, from whom Gallas bought his land, testified at the hearing in this matter that he told the defendant there was a pipeline running under the Gallas property near the western boundary line. Gallas denied he was ever told anything about the pipe. Even if Hanson's testimony is believed, Gallas still did not know the actual location of the water line; Hanson ap-

parently thought it was at the same location the court has found set out in the deed, i. e., 105 feet west of the plaintiff's pipeline.

5. The government's cadastral engineer, Edgar L. Gray, agreed with the defendant's surveyor, Edwin J. Kirby, Sr., that he would have drafted the description differently.

cannot maintain the action of ejectment in Maryland. Corey v. Carback, 201 Md. 389, 94 A.2d 629 (1953); Green v. Pennsylvania R. Co., 141 Md. 128, 118 A. 127 (1922); Joseph v. Bonaparte, 118 Md. 591, 85 A. 962 (1912).

 The last problem presented is that of adverse possession. One holding title by adverse possession can maintain ejectment, Joseph v. Bonaparte, supra. Thus, the plaintiff might be able to sustain its case on this basis; however, here, too, the government cannot succeed. An ancient requirement of adverse possession is that the possession by the claimant be open and notorious, Goen v. Sansbury, 219 Md. 289, 149 A.2d 17 (1959), giving presumptive notice of the adverse possession to the true owner, Beatty v. Mason, 30 Md. 409 (1869). It is highly questionable if the plaintiff's possession of a pipeline buried in the ground and without surface markings on the defendant's property was of such a character. Further, claimant must maintain his adverse possession for at least twenty years, Goen v. Sansbury, supra; Cox v. Forrest, 60 Md. 74 (1882); Lee v. Hoye's Lessee, 1 Gill (Md.) 188 (1843). Possession for any lesser period is insufficient. Stinchcomb v. Realty Mo: tgage Co., 171 Md. 317, 188 A. 790 (1937). In the present case, the government was in unchallenged possession of the land around the pipeline from November of 1942 to the time Gallas began to build his house, which was at least some time before September, 1962. Gallas' movement onto the land over the pipeline in the act of the construction of his house effectively cut off the sole possession by the plaintiff, Goen v. Sansbury, supra, and prevented the plaintiff from maintaining possession for the prescriptive period. The plaintiff has not gained title to the land by adverse possession.

Therefore, since the plaintiff did not acquire title to the land in dispute by purchase or in any other fashion, the court must dismiss its suit in ejectment.