957 A.2d 1057

### Linda Ann SENEZ

v.

### Ann COLLINS, et al.

No. 111, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Oct. 3, 2008.

302

Bruce E. Covahey (Edward C. Covahey, Jr., Covahey, Boozer, Devan Dore, PA, on brief), Towson, for Appellant.

Robert J. Thompson (J. Calvin Jenkins, Jr., on brief), Towson, for Appellee.

Panel: KRAUSER, C.J., HOLLANDER and CHARLES E. MOYLAN, JR., (retired, specially assigned), JJ.

HOLLANDER, J.

This appeal arises from a dispute as to the ownership of a 291–square–foot sliver of land situated along the boundary of two adjoining waterfront properties in the Middle River area of Baltimore County. The disputed area also includes a portion of a concrete boat ramp that straddles the common boundary. Linda Ann Senez, appellant, is the owner of 341 Worton Road (the "Senez Property"); Ann and Steve Collins, appellees, own 339 Worton Road (the "Collins Property"). Both properties front on Norman Creek, a tributary of the Chesapeake Bay, and each contains a single family home.

In September 2004, appellees filed a quiet title action in the Circuit Court for Baltimore County, and also alleged claims, *inter alia*, of trespass and nuisance. Appellant filed a counterclaim based on adverse possession. Following a bench trial in 2006, the court ruled in favor of appellees as to most of their claims, including adverse possession.

On appeal, appellant presents one issue: "Whether the circuit court erroneously denied the appellant's adverse possession claim despite the evidence of twenty-three years of hostile possession and the absence of any clear and unequivocal acts by the appellees to challenge her exclusive, hostile possession."

For the reasons that follow, we answer in the affirmative and shall therefore vacate the judgment and remand for further proceedings.

## FACTUAL AND PROCEDURAL SUMMARY

Appellant purchased the Senez Property on November 22, 2000, and began to live there immediately. Her predecessors in title, Arthur L. and Joan E. Myers ("the Myers"), had previously acquired the property on April 6, 1981, and lived there continuously for approximately nineteen years and seven months.

Appellees purchased the Collins Property on August 14, 2000, from the estate of George Cook, who had owned the property with his wife, Madeline Cook ("the Cooks").[1] The Cooks had acquired the property on August 7, 1973. In October 2000, appellees tore down the existing house on the property and commenced construction of a new home. As a result, they did not begin living on the property until late July 2001. Thus, although appellees purchased the Collins Property before appellant acquired the Senez Property, appellant was already living on her property before appellees moved into theirs.

At the time the parties purchased their respective properties, the properties were separated by a concrete retaining wall (the "Wall"), which did not precisely track the property line. The Wall, approximately 115 feet long, extended almost the entire length of the boundary between the properties, beginning some 75 feet from Worton Road and terminating at the point where the Wall met a concrete sea wall, or bulkhead,

---

1. We assume that Ms. Cook predeceased her husband.

which separated the Collins Property from Norman Creek. A survey of the Senez Property, which was conducted for appellant by Bryan R. Dietz, and which was later admitted at trial as a joint exhibit (the "Dietz Survey"), showed that approximately 35 feet before meeting the sea wall, the Wall diverged from the boundary line. Between that point and the sea wall, according to the Dietz Survey, the Wall sat entirely on the Collins side of the property line. As a result, a narrow strip of the Collins Property was located on the Senez side of the Wall. That narrow strip between the Wall and the boundary line is the area of land in dispute.

The disputed area contains part of a concrete boat ramp that extends past the sea wall, providing access from the Senez Property to Norman Creek. The boat ramp is entirely on the Senez side of the Wall. But, because the Wall does not follow the boundary, a portion of the boat ramp falls on the Collins side of the property line. In the disputed area, the elevation of the ground on the Senez side of the Wall is a few feet higher than the elevation on the Collins side. As noted, the Wall was a retaining wall; it maintained the properties at their differing elevations.

On September 29, 2004, appellees filed suit against appellant, seeking monetary damages and injunctive relief, on the grounds of trespass, continuing trespass, private nuisance, quiet title, and invasion of privacy.[2] In relevant part, appellees contended that they owned "one half of a boat ramp which straddles the parties' properties," and that appellant had "[i]nstalled a wood fence between the properties, which fence not only encroaches on the Collins Property but at the south end of the Collins Property, also blocks access by [appellees]

---

2. The Complaint also contained a seventh "count," which was merely a prayer for injunctive relief. Appellees' nuisance and invasion of privacy counts were grounded in allegations that, as the neighbors' relationship deteriorated, appellant placed hostile signage and video cameras on the Senez Property facing the Collins Property. In rulings that appellees do not contest, the court awarded judgment in appellant's favor on these counts. We need not discuss these allegations further, as they are not germane to the issues on appeal.

to that part of the Collins Property which includes the shared boat ramp."

In her Answer, appellant contended that she "presently owns the entirety of the boat ramp by adverse possession." She also denied "the allegation that any portion of the fence encroaches upon the Collins Property insofar as she presently owns the property in question by adverse possession." Then, on November 8, 2004, appellant filed a "Counterclaim for Title by Adverse Possession and Bill to Quiet Title." [3] She alleged that "the Senez Property is . . . marked at its boundary with the Collins Property by a one-foot wide block wall and a wooden privacy fence," and that she "and her predecessors in title for more than the prescriptive period of twenty (20) years have maintained the lawn, erected and/or maintained fencing and/or the aforedescribed block wall and/or have otherwise exercised actual peaceable possession" of the disputed area. Further, appellant contended that her predecessors' possession, as well as her own, had been "actual, open, notorious, exclusive and hostile, and that said possession has been continuous and uninterrupted," thus satisfying the requirements for adverse possession.

The matter was heard by the circuit court, sitting without a jury, in December 2006.[4] All of the parties testified at trial.[5]

---

3. The Counterclaim was initially filed against appellees and their mortgage lender, National City Mortgage Company. Subsequently, appellant voluntarily dismissed National City as a counter-defendant.

4. Days before trial, appellees filed an Amended Complaint, which added claims of adverse possession against appellant, relating to a separate portion of land closer to the properties' western boundary at Worton Road, where the Wall again crossed the property line as surveyed, in this instance crossing onto the Senez Property and leaving a sliver of the Senez Property on the Collins side of the Wall. Appellant responded the next day with a Motion to Strike Amended Complaint as untimely. At the outset of trial, the court heard argument on the motion. It subsequently denied the motion to strike, concluding that it was "easier to resolve this issue." The court later denied appellees' adverse possession claim. Appellees have not challenged that ruling.

5. Some of the testimony related to issues that are not contested on appeal. Therefore, we shall omit reference to that testimony. More-

At trial, the court received into evidence as a joint exhibit the *de bene esse* deposition testimony of Arthur Myers, the prior owner of the property acquired by appellant. In his deposition, Mr. Myers stated that he purchased the property with his wife in 1980, but did not secure a boundary survey at that time. Mr. Myers recalled that the Wall (or a predecessor to it) was already in place when he purchased the property now owned by appellant. He did not know who originally constructed the Wall, however. Mr. Myers did not realize that the Wall did not track the property line, and he assumed that the Wall was situated on his neighbors' side of the boundary. According to Mr. Myers, in the late 1980's a portion of the original Wall fell down; the Cooks had the Wall rebuilt in the same footprint, at their own expense, with a better foundation and "weep holes" to allow drainage.

Throughout the time the Myers owned what is now the Senez Property, both when the original Wall existed and after the construction of the replacement Wall, the Myers maintained the property up to the Wall, doing yard maintenance and the like. According to Mr. Myers, the Cooks never objected to his maintenance of the property up to the Wall.

Mr. Myers recounted that he constructed the boat ramp while he lived at the property.[6] Although Mr. Myers did not obtain a boundary survey at that time, he claimed that he never received any complaints that the boat ramp encroached on the Cooks' property. Mr. Myers never expanded the ramp, and had no need to perform significant maintenance on it.

In addition, Mr. Myers constructed a wooden sea wall, or bulkhead, across the eastern side of his property, fronting on

over, because the testimony of Steve Collins was largely duplicative of that of Ann Collins, we shall omit reference to most of it.

**6.** It is not clear when the ramp was built. Throughout Mr. Myers's deposition, he often misstated the year of an event. For instance, he initially responded that he bought the Senez Property in 2000, then corrected himself to 1980. Moreover, he testified that he constructed the ramp in 2000, but also stated that people used the ramp during the '80s and '90s.

Norman Creek. At the same time, he constructed a wooden bulkhead on the Cooks' side of the boat ramp, extending to the concrete sea wall along the east side of what is now the Collins Property. He explained that, due to erosion from the creek, "we were losing property."[7] Mr. Myers testified:

> The only discussion I had with George [Cook] was when I was gonna build the bulkhead the water had started eroding around his bulkhead and I say, "Well, I'll tie it into your bulkhead so the water can't get down there." You see, it was undermining his bulkhead, so that's why, if you see that there's some curve in this when I brought it back to meet his bulkhead.

Mr. Myers allowed many neighbors to use the boat ramp, "with permission." In particular, he recalled that he allowed various neighbors to use the ramp during a period in which "the local [public] ramp closed, and until it was opened again, I allowed them to come down and put their boats in." According to Mr. Myers, this use was infrequent, and "anyone [who] would launch their vessel from [his] ramp did so after first securing [Mr. Myers's] permission." Mr. Myers was emphatic that the ramp "was not open to the public [such] that they could wander down [the] property."

With regard to the Cooks, however, Mr. Myers asserted that there was no formal "understanding." In his words, "I'm a neighbor and I offered it." Mr. Myers also assisted the Cooks with launching boats from the ramp. When asked whether he recalled seeing anyone from the Cook family ever cross the Wall and use the boat ramp, Mr. Myers said: "I wouldn't have thought anything of it if they did." Mr. Myers indicated that, "to his recollection," after appellees purchased the Collins Property "they never used" the ramp.

Shortly before Mr. Myers sold his property to appellant in 2000, he obtained a survey of the property, to ensure that a fence he intended to construct on the southern boundary of his

---

7. This wooden bulkhead is shown on the Dietz Survey as "wooden sea wall." In effect, the wooden bulkhead extends the Wall past the concrete sea wall; it is wholly on the Collins side of the property line.

property (i.e., the opposite side from the Collins Property) correctly followed the property line. The surveyor informed Mr. Myers that, on the northern side of his property, there was "about a foot difference" between the Wall and the actual property line, such that the Wall was "a foot back from the property line onto 33 9," i.e., the Collins Property. Mr. Myers said that his primary interest was the correct placement of the fence on the southern side of the property, rather than the northern property line, but he placed the survey in the materials shown to prospective buyers of his property. He commented that "anybody who was buying it could look at that survey and figure it for themselves what they wanted to do with it."

Ann Collins testified that she and her husband purchased the Collins Property in August 2000. The Myers were their next-door neighbors until appellant purchased the Senez Property and moved in around Thanksgiving of 2000. Appellees did not move in immediately, however, because they were replacing the existing house on their property with a new one. Nevertheless, Ms. Collins said that she visited the property often, particularly to do gardening. She claimed that, before the existing house was demolished in October 2000, she was there "almost every day. And then, on the weekends Steve and I would go down and spend two nights there. We got a blow-up mattress."

Ms. Collins maintained that she frequently used the boat ramp. The following colloquy is relevant:

[APPELLEES' COUNSEL]: How many times did you use the boat ramp between, well, between let's say, the time you moved in and the time your house was completed?

[MS. COLLINS]: Well, when Mr. Myers was there it was much easier, we just jumped over the wall. We used it as a launch for our swimming. We had a canoe or, at least, some people brought a canoe out of the water all the time, my children, my friends, Shirley, we went swimming there.

[APPELLEES' COUNSEL]: When you say you jumped over the wall, you mean the retaining wall you believe is on your property?

[MS. COLLINS]: Yes.

[APPELLEES' COUNSEL]: Okay. At that time was there—you were talking about Mr.—when Mr. Myers was there?

[MS. COLLINS]: Yes.

[APPELLEES' COUNSEL]: At that time there was no fence?

[MS. COLLINS]: No, no.

[APPELLEES' COUNSEL]: Did Mr. Myers give you permission to use the boat ramp?

[MS. COLLINS]: There was never any question about permission.

[APPELLEES' COUNSEL]: So you didn't ask permission?

[MS. COLLINS]: Absolutely not.[8]

[APPELLEES' COUNSEL]: You told [the judge] earlier you—you and Mr. Myers got along very well?

[MS. COLLINS]: Yes.

[APPELLEES' COUNSEL]: You used the boat ramp frequently?

[MS. COLLINS]: Yes, because the house wasn't built, we didn't have any furniture. We would go over there and sit.

According to Ms. Collins, before appellant moved into the Senez Property in November 2000, appellant hired a contractor to erect a wooden fence that ran along the Wall, sitting just on the Senez side of the Wall. Ms. Collins recalled that before appellant constructed the fence, the two discussed its location. Ms. Collins said:

When we were down there planting she called me towards the fence or towards the wall and said, can my fence follow the wall instead of the property line? And I said, hum, I

---

8. As noted, Myers indicated that he had no knowledge that appellees used the boat ramp.

can't answer that because my husband and I own the property jointly, we'll have to talk about it.

Nevertheless, Ms. Collins maintained that the fence was "absolutely" constructed without appellees' permission. At trial, Ms. Collins was asked: "After the fence was constructed and you became aware of it, did you have any conversations with Ms. Senez about the fence?" Collins responded: "Yes, we did." She continued: "[Appellant] said we did not say no."

Mr. Collins corroborated his wife's testimony as to this point. He denied that they gave Ms. Senez permission to build the fence. Mr. Collins recalled: "We were [asked for permission to build the fence] and, unfortunately, we did not respond quick enough for her. Um, when we returned to the property the fence was in place." [9]

Ms. Collins admitted that both before and after the fence was erected, she maintained the Collins Property only up to the Wall; the Myers, and later appellant, maintained the property on the other side of the Wall. Despite the concerns about the fence, Ms. Collins testified that until April 2004, appellees and appellant had a cordial relationship, which included possessing keys to each other's homes. They would also socialize together and take care of each other's pets, as needed.

Moreover, Ms. Collins claimed that appellees and their children continued to use the ramp after appellant moved into the Senez Property; they launched their canoe from the ramp "several dozen" times. At some point after appellant initially constructed the fence, however, she extended it along the Wall towards the water, with wire fencing, purportedly to keep her dogs in her yard.[10] After the fence was extended, it was no longer possible for appellees to cross between the two properties at the end of the Wall to gain access to the ramp.

---

**9.** This was the extent of Mr. Collins's testimony as to the construction of the fence.

**10.** No testimony established exactly when this took place.

According to Ms. Collins, appellant's property suffered storm damage as a result of Hurricane Isabelle in 2003. As a result, appellant had to replace a railroad-tie retaining wall on her property that ran parallel to the Wall and supported a terraced yard adjacent to the house on the Senez Property. Appellant rebuilt the railroad-tie wall higher than its original, and constructed a fence or railing atop it, which blocked appellees' view down Norman Creek from their property.[11] Ms. Collins also testified that appellant regraded the area between the replaced terrace wall and the Wall, such that more water would run off onto appellees' property.

Ms. Collins admitted that she and her husband began to inquire with various permitting authorities as to whether appellant had acquired the necessary permits to erect the replacement terrace wall. At that point, in April or May of 2004, the relationship between the neighbors began to sour. At some point (Ms. Collins did not specify a date), appellant constructed a wooden gate across the boat ramp, supposedly to keep her dogs from entering the water. At another point, according to Ms. Collins, appellant "slurried concrete in the water" to make the boat ramp longer and wider.

For reasons that Ms. Collins did not explain, at some point appellees used concrete to block the weep holes in the Wall. This ultimately caused a portion of the Wall to fall down in 2006.

Although appellant's perspective was significantly different, appellant agreed with appellees about many matters. She testified that, at first, she and appellees "became friends." She "invited them to [her] house to have drinks, occasionally, out on the deck. Watched fireworks together down on the lower level of the property. Exchanged keys to the house so in the event [she] got home late they could let [her] dog out," and vice versa.

---

11. When Senez rebuilt the railroad-tie wall, she did not use railroad ties for construction. We shall refer to this wall and the fence or railing atop it as the "terrace wall" and "terrace fence," to avoid confusion with the Wall and the privacy fence that appellant constructed along it.

According to appellant, she hired a contractor to erect the fence along the Wall prior to final settlement on the Senez Property with the Myers. At the time she decided to construct the fence, she had not yet met appellees. She explained that after she hired the contractor, "the contractor talked about possibly putting [the] fence . . . up on top of the [W]all," rather than alongside it, so as to "eliminate that small space between the fence and the [W]all." She claimed that she "mentioned" this possibility to appellees, who did not respond affirmatively or negatively, and there was "no further conversation." Accordingly, she "just decided to put the fence . . . right next to the wall."

Appellant recounted that "Mrs. Collins occasionally asked for permission to come to the boat ramp to feed the ducks or geese with her granddaughter," and appellant granted permission. According to appellant, appellees never requested to launch a boat from the ramp, nor objected when she repaired the ramp. She testified that she extended the ramp further into Norman Creek, but did not widen it.

According to appellant, in late April of 2004, appellees complained that her construction of the terrace wall and terrace fence blocked their view of the water. She recalled that she met with appellees on May 9, 2004, a date which she remembered because it was her father's birthday, "and that's when Mr. Collins told [her] that half the boat ramp was his." Appellant stated: "I was a little surprised because I had assumed my property line had gone to the wall. . . ." According to appellant, she offered to purchase the sliver of land, but said that the parties first would have to obtain a boundary survey to establish the property line. She recalled that Mr. Collins made her a counter-offer: "[H]e told me if I take the boathouse down, if I give him permission to take the boathouse down and pay for it, he would gift me the piece of property." According to appellant, Mr. Collins had told her on previous occasions that he considered her boathouse an "eyesore."

Appellant declined Mr. Collins's offer, and at that point their relationship deteriorated. She stated: "After that, it

became quite heated, with Baltimore County coming out to the property, pulling permits, putting a stop order." She recounted that on approximately a dozen occasions she met with various county, state, and federal permitting agencies as a result of complaints lodged against her by appellees.

On cross-examination, appellant was asked whether she asked appellees' permission to install the initial fence she erected along the Wall. She responded:

> No, I did not ask permission. I discussed with them, putting the fence on top of the wall to minimize and reduce four inch space [sic] between the wall and the fence, and it was only in a passing thought as to what to do. I never heard back from them. I really didn't pursue it. I thought it was just as easy for me to put in—in the ground and probably cheaper.

At the close of the hearing, the court made an oral ruling, granting judgment in favor of appellees on their trespass, possession, and quiet title claims, but awarding no damages. The court also denied appellant's adverse possession claim. On December 20, 2006, the court entered its "Final Judgment," which it followed, *sua sponte,* on December 21, with an "Amended Final Judgment" to correct the inadvertent omission of a provision it had dictated in open court.[12]

Appellant filed a "Motion to Alter/Amend Judgment, or in the Alternative, Motion for New Trial" on January 2, 2006, seeking reconsideration of the court's ruling on the issue of adverse possession, and seeking further clarification of the court's order relating to ownership of the boat ramp. She contended that the terms of the court's order had inadvertently created an "easement by implication" with respect to the boat ramp. Appellees opposed the motion.

In response, the court issued its "Second Amended Final Judgment" on February 23, 2007, in which it clarified the

---

**12.** The Amended Final Judgment permitted the parties to come to an agreement that would obviate the necessity of removing the gate across the boat ramp.

language of its order relative to the boat ramp, but otherwise denied the motion. In this ruling, as to appellee's possession of property and quiet title claims, the court said:

4. Judgment on Count IV (possession of property) is hereby entered in favor of [appellees] and against [appellant] in that [appellant] is hereby ORDERED, absent an agreement by the parties to the contrary, to remove any gate or fence blocking access by the parties for the enjoyment and use of the boat ramp presently located on the east side of 339 and 341 Worton Road at Norman Creek. [Appellees] own approximately fifteen (15%) percent of the boat ramp on the side closest to their property; [appellant] owns the remaining eighty-five (85%) percent.

5. Judgment on Count V (quiet title) is entered in favor of [appellees] and against [appellant] in that the 291 square foot area ... shall remain the property of [appellees].... [F]urther, [appellant] shall remove the fence presently existing on [appellees'] property.

Further, the court said: "Judgment on the Counter Claim (for title by adverse possession) is hereby entered in favor of [appellees]." As to appellees' trespass claims, the court awarded judgment in appellees' favor, without damages. But, the court entered judgment in favor of appellant as to appellees' claims of nuisance and invasion of privacy, as well as their claim to title by adverse possession over an area of land other than the disputed area on appeal. The court also denied appellees' request for a permanent injunction.

The court accompanied the Second Amended Final Judgment with a written "Motions Ruling" concerning appellant's motion to alter or amend. The court made the following findings of fact and conclusions of law:

Under Maryland law, to obtain title to property, the person claiming adverse possession must prove actual, open, notorious and visible, exclusive, hostile and continuous possession of the claimed property for at least 20 years. *Bratton v. Hitchens*, 43 Md.App. 348, 405 A.2d 333 (1979); *Blickenstaff v. Bromley*, 243 Md. 164, 220 A.2d 558 (1966).

\* \* \*

In 1981, when the Myers took title to 341, a concrete wall existed along the property line of 341 and 339. The wall fell sometime in the 1980's and was rebuilt by Cook (owner of 339) in the original wall's foot print. The wall sat partly on 339, and partly on 341, crossing the boundary line at one point. Myers installed a boat ramp which sat on both properties. In addition, Myers had a bulkhead installed across the waterfront of 341 to the boat ramp. Myers maintained the property on the 341 side of the wall, including the boat ramp.

Myers granted permission to neighbors to use the property between Myers' house and the wall, including the boat ramp, to access the waterfront to launch boats, in part, because a local boat ramp had closed.

The Cooks, including their son-in-law used the boat ramp. As a result, the Court does not infer that Mr. and Mrs. Myers' possession of 341 and use of the property in dispute was adverse to the Cooks. When [appellees] purchased 339, they too used the boat ramp, as did [appellant] when she purchased 341. At the time [appellant] purchased her property, [appellee] had already used the boat ramp to launch canoes and to feed ducks. Thus, by using their property, [appellees] were in possession of their property.

Initially, the parties were friendly. It is unfortunate for both sides that their friendship has not continued. The Court found [appellees'] testimony that they had never asked permission to use the boat ramp credible. The Court did not find credible [appellant's] testimony that [appellees] asked her for permission. Nor does the Court accept the suggestion that [appellees] were required to file suit to assert their ownership of the property in dispute.

[Appellant] added a gate to the boat ramp to prevent her dogs from going into the water on the ramp. [Appellees], who also have dogs, did not object to the addition of the gate. The Court did not view the gate as evidence sufficient to deprive the [appellees] of their property.

From the time she acquired 341 in November 2000, [appellant] maintained the boat ramp and the property on her side of the wall. Most of the boat ramp is on [appellant's] property; maintaining the boat ramp is clearly in her best interest. Neglecting to maintain one side of it, the small portion which is on [appellees'] property, could result in collapse or other failure of the ramp. [Appellant's] maintenance of the small sliver of area in front of the wall as well as the ramp were not, in the Court's view, sufficient evidence of control to deprive [appellees] of their property.

In his deposition testimony, Arthur Myers testified that he always cooperated with his neighbors, the Cooks. While it is true that he mowed the grass in the area now in dispute, he did not appear to view his actions as an assertion of control or dominion over the area. At best, Myers' actions toward the property in dispute indicate use or "actual possession" of the property in question but nothing more. When he decided to sell 341, Myers commissioned a survey of the property. The survey shows the property line and area in dispute. Myers included the survey with the documents he provided to all prospective buyers including [appellant]. Contrary to the testimony of [appellant], Myers said that he showed a copy of the survey to [appellant] when he was selling 341 to her.[13]

\* \* \*

Myers' testimony is clear that he and the Cooks were friendly throughout the years they were neighbors. There is no evidence in the record that there was any adversity or hostility between them. Although no ill-will is required, there must be some proof. Myers believed when the wall was built, and then rebuilt, that it was on his property. There is no evidence that his use of the area was "exclusive." The neighbors were friendly, and cooperative.

[Appellant] argues that when Myers' ownership is added to her ownership, she has met the 20 year requirement.

---

**13.** Mr. Myers's deposition does not contain a specific assertion that he showed the survey to appellant in particular. Rather, he indicated that he put the survey in the materials he showed purchasers generally.

Myers owned his property for 19 years and 7 months. But during the last few months of his ownership, [appellees] acquired 339 Worton and used the boat ramp. Myers did not testify he gave them permission; and, [appellees] testified they never asked. The pages from Myers' desposition transcript cited by [appellant] for the proposition that Myers "granted permission" to [appellees] do not make that statement. *[Appellees'] use of the area in dispute destroys the claimed 20 years period required for [appellant] to establish her adverse possession claim.*

The Court was not persuaded that the fact that [appellees] did not move into their residence at 339 full-time until the year after purchase helps [appellant's] claim. The testimony was uncontradicted that [appellees] made frequent visits to 339 Worton for recreation, boating and supervision of the demolition and construction. Further, there was persuasive testimony that [appellee] Ann Collins used the boat ramp before and after residing at 339 Worton. Use of the boat ramp without seeking permission by [appellee] was the equivalent of asserting an ownership interest or dominion over the property.

In sum, the Court was not persuaded that [appellant] met her burden of proof by a preponderance of the evidence to establish adverse possession of the area in dispute. (Emphasis added.)

## DISCUSSION

The issue here is whether the court erred in concluding that appellant did not acquire title to the disputed area by adverse possession.[14] This Court recently discussed the doctrine of adverse possession in *Yourik v. Mallonee,* 174 Md. App. 415, 422, 921 A.2d 869 (2007):

"Adverse possession is a method whereby a person who was not the owner of property obtains a valid title to that

---

14. When we review an action that has been tried without a jury, our review of the circuit court's findings of fact is governed by Md. Rule 8–131(c) (2008):

property by the passage of time." *Md. Civ. Pattern Jury Instr.* 2:1 (MPJI–Civ.). "A number of policy justifications for the doctrine of adverse possession have been advanced." Herbert T. Tiffany & Basil Jones, *Tiffany Real Property,* Neighbor § 6:2 (1975, through Sept. 2006) (hereafter cited as *"Tiffany "*). Most commonly, "courts justify the existence and application of adverse possession" for one or more of the following reasons:

First, there is a societal interest in "quieting" title to property by cutting off old claims. Second, there is a desire to punish true owners of land who neglect to assert their proprietary rights. Third, there is a need to protect the reliance interests of either the adverse possessor or others dealing with the adverse possessor that are justifiably based on the *status quo.* Last, an efficiency rationale, asserting a goal of promoting land development, seeks to reward those who will use land and cause it to be productive.

*Id.*

██ The elements of adverse possession are well settled: " 'To establish title by adverse possession, the claimant must show possession of the claimed property for the statutory period of 20 years.... Such possession must be actual, open,

---

When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

"A factual finding is clearly erroneous if there is no competent and material evidence in the record to support it." *Hoang v. Hewitt Ave. Assocs., LLC,* 177 Md.App. 562, 576, 936 A.2d 915 (2007); *see YIVO Inst. for Jewish Research v. Zaleski,* 386 Md. 654, 663, 874 A.2d 411 (2005). But, the "clearly erroneous" standard does not apply to questions of law. " 'When the trial court's [decision] involves an interpretation and application of Maryland statutory and case law, [the appellate court] must determine whether the lower court's conclusions are legally correct....' " *White v. Pines Cmty. Improvement Ass'n,* 403 Md. 13, 31, 939 A.2d 165 (2008) (citation omitted). We make this determination *de novo,* without any deference to the legal conclusions of the lower court. *See Yourik v. Mallonee,* 174 Md.App. 415, 423 n. 2, 921 A.2d 869 (2007) (standard of appellate review of judgment concerning adverse possession); *Porter v. Schaffer,* 126 Md.App. 237, 259, 728 A.2d 755, *cert. denied,* 355 Md. 613, 735 A.2d 1107 (1999) (same).

notorious, exclusive, hostile, under claim of title or ownership, and continuous or uninterrupted.'" *White v. Pines Cmty. Improvement Ass'n,* 403 Md. 13, 36, 939 A.2d 165 (2008) (citation omitted); *see also, e.g., E. Wash. Ry. v. Brooke,* 244 Md. 287, 294, 223 A.2d 599 (1966); *Bishop v. Stackus,* 206 Md. 493, 498, 112 A.2d 472 (1955); *Gore v. Hall,* 206 Md. 485, 490, 112 A.2d 675 (1955). The "statutory period" is established by Md.Code (2006 Repl.Vol., 2007 Supp.), § 5–103 of the Courts and Judicial Proceedings Article ("C.J."), which requires that "[w]ithin 20 years from the date the cause of action accrues," a landowner must either "[f]ile an action for recovery of possession of a corporeal freehold or leasehold estate in land," or "[e]nter on the land."

▪ Initially, "[t]he burden of proving title by adverse possession is on the claimant." *Costello v. Staubitz,* 300 Md. 60, 67, 475 A.2d 1185 (1984); *see Hungerford v. Hungerford,* 234 Md. 338, 340, 199 A.2d 209 (1964); *Porter v. Schaffer,* 126 Md.App. 237, 276, 728 A.2d 755, *cert. denied,* 355 Md. 613, 735 A.2d 1107 (1999). We have said: "In evaluating a claim, the pertinent inquiry is whether the claimant has proved the elements 'based on the claimant's "objective manifestation" of adverse use, rather than on the claimant's subjective intent.'" *Porter,* 126 Md.App. at 276, 728 A.2d 755 (quoting *Barchowsky v. Silver Farms, Inc.,* 105 Md.App. 228, 241, 659 A.2d 347, *cert. denied,* 340 Md. 301, 666 A.2d 1236 (1995)).

Broadly, the elements of adverse possession can be placed in three groups: possession must be (1) actual, open and notorious, and exclusive; (2) continuous or uninterrupted for the requisite period; and (3) hostile, under claim of title or ownership.[15] We shall address these three categories of elements, *seriatim.*

▪ The first group of elements concerns the requirement that possession be actual, open and notorious, and

---

**15.** Notably, the classic formulation of the elements of adverse possession contains several words that are terms of art. In *Yourik,* 174 Md.App. at 427, 921 A.2d 869, we recognized: "The plethora of phrases ... may confuse rather than clarify." Ordinarily, "[a]cts that make

exclusive. For the purpose of this case, all of these elements essentially collapse into the requirement of actual use. The element of "open and notorious" pertains to the concept of constructive notice to the title owner. Possession "must be visible and notorious, so that the owner may be presumed to have notice of it." *Beatty v. Mason,* 30 Md. 409, 414 (1869). However, actual notice to the owner is not required. "Possessory acts of dominion over land may be sufficient to charge the record owner with knowledge that the land is adversely possessed." *Miceli v. Foley,* 83 Md.App. 541, 561, 575 A.2d 1249 (1990) (citing *Blickenstaff v. Bromley,* 243 Md. 164, 220 A.2d 558 (1966)).

 "Exclusive possession means that the claimant must possess the land as his own and not for another." *Orfanos Contractors, Inc. v. Schaefer,* 85 Md.App. 123, 130, 582 A.2d 547 (1990). The *Blickenstaff* Court quoted 3 AM. JUR.2d, ADVERSE POSSESSION, § 50, for the following proposition:

> "[E]xclusive possession simply means that the disseisor must show an exclusive dominion over the land and an appropriation of it to his own use and benefit. An adverse claimant's possession need not be absolutely exclusive, however; it need only be a type of possession which would characterize an owner's use."

*Blickenstaff,* 243 Md. at 173, 220 A.2d 558.

 Determination of whether a claimant is in actual possession of the claimed land is a fact-intensive inquiry.

---

possession 'actual' are ... sufficient to make it visible and notorious." *Orfanos Contractors, Inc. v. Schaefer,* 85 Md.App. 123, 130, 582 A.2d 547 (1990) (citation omitted); *see also Blickenstaff v. Bromley,* 243 Md. 164, 170, 220 A.2d 558 (1966) (determining that the court "may conveniently consider ... together" factors of actual, open and notorious, and exclusive possession). Moreover, "the terms 'claim of title,' 'color of title,' 'claim of ownership,' and 'claim of right,' all ... are alternative methods of proving that the claimant's possession was sufficiently 'hostile' to be 'adverse.' " *Yourik,* 174 Md.App. at 424, 921 A.2d 869. In other words, "a 'claim of title or ownership' is not a separate and distinct element of an adverse possession claim, in addition to hostility." *Id.* at 426–27, 921 A.2d 869.

Clearly, "something more than 'mere occasional use of land' is needed." *Porter*, 126 Md.App. at 277, 728 A.2d 755 (quoting *Barchowsky*, 105 Md.App. at 241, 659 A.2d 347). But, "the character, location, and use of lands vary, and the type of possessory acts necessary to constitute actual possession in one case may not be essential in another." *Blickenstaff*, 243 Md. at 171, 220 A.2d 558. Therefore, "the court must consider the character and location of the land and the uses and purposes for which the land is naturally adapted." *Orfanos Contractors*, 85 Md.App. at 129, 582 A.2d 547; *see also Goen v. Sansbury*, 219 Md. 289, 296, 149 A.2d 17 (1959); *Miceli*, 83 Md.App. at 553, 575 A.2d 1249. As we said in *Porter*, 126 Md.App. at 277, 728 A.2d 755, "acts sufficient to demonstrate possession of wild, undeveloped forest may fall short of the activity needed to establish possession of developed property." Similarly, in *Blickenstaff*, 243 Md. at 171, 220 A.2d 558, the Court explained:

"It is sufficient if the acts of ownership are of such a character as to openly and publicly indicate an assumed control or use such as is consistent with the character of the premises in question. The standard to be applied to any particular tract of land is whether the possession comports with the ordinary management of similar lands by their owners, and if so, it furnishes satisfactory evidence of adverse possession."

(Quoting 3 AM.JUR.2D, ADVERSE POSSESSION, § 14); *accord Mauck v. Bailey*, 247 Md. 434, 441, 231 A.2d 685 (1967).

Appellant suggests that the circuit court "conceded that Mr. Myers was in 'actual possession' of the disputed property." She claims that her maintenance and improvement of the disputed area was "equivalent" to that of the Myers, and contends that the circuit court "inexplicably concluded that such actions 'were not, in the Court's view, sufficient evidence of control to deprive [appellees] of their property.' "

According to appellant, the Myers maintained the property up to the Wall (i.e., on land titled at the time to the Cooks); constructed the boat ramp; and maintained the waterfront

north of the ramp by installing the wooden bulkhead. She asserts that she "exercised further control over the disputed property," which belonged to the Cooks, "by erecting a . . . privacy fence along the existing Wall, improving the boat ramp with a gate, [and] maintaining the boat ram p. . . ." In her view, the actions that she and the Myers took with respect to the disputed area are "nearly identical" to those in *Blickenstaff* which, according to the Court of Appeals, constituted actual possession. Moreover, she maintains that the court's "curious observation that Appellant's action[s] were undertaken in her best interest is of no consequence in this regard, as the actions of *any* possessor of land are generally exercised in furtherance of the possessor's best interests."

Appellees dispute appellant's characterization of the circuit court's decision, commenting: "Appellant's brief reads as though the trial court had found that but for the reentry on the land by Appellees, Appellant's predecessor in title would have perfected an adverse possession claim." They assert: "As a matter of fact, what the trial judge concluded . . . is that 'At best, Myers' actions toward the property in dispute indicate use or "actual possession" of the property but nothing more.'" However, appellees do not pursue the point, insisting instead that "whether Mr. Myers' possession of the 291 square feet was adverse is immaterial to an adverse possession analysis here because the requisite 20 years period was interrupted" when appellees reentered the land after their purchase. Appellees also concede that appellant has had actual possession at least since she constructed the "privacy fence" running along the Wall. They recognize that this "effectively ousts [appellees] from exercising dominion over that portion of their titled real property."

In our view, the circuit court seemed to assume, *arguendo*, that the Myers had actual possession of the disputed area. The court found the following facts as to the Myers: "Myers installed a boat ramp which sat on both properties. In addition, Myers had a bulkhead installed across the waterfront of 341 to the boat ramp. Myers maintained the property on the 341 side of the wall, including the boat ramp." As to

appellant, the court found that she "added a gate to the boat ramp to prevent her dogs from going into the water on the ramp," and that, "[f]rom the time she acquired 341 in November 2000, [appellant] maintained the boat ramp and the property on her side of the wall." The court discounted these findings, however, reasoning that appellees, "who also have dogs, did not object to the addition of the gate," and that "[m]ost of the boat ramp is on [appellant's] property; maintaining the boat ramp is clearly in her best interest. Neglecting to maintain one side of it, the small portion which is on [appellees'] property, could result in collapse or other failure of the ramp." The court concluded that none of appellant's maintenance activities were "sufficient evidence of control to deprive [appellees] of their property."

We disagree. In our view, appellant's maintenance of the disputed area and the boat ramp was a paradigmatic example of the type of use that the cases have recognized as establishing actual possession. Both the Myers and appellant engaged in a course of use, maintenance, upkeep, and improvement upon the disputed area that was consistent with the " 'ordinary management' " that one would expect the owner of such land to undertake. *Blickenstaff*, 243 Md. at 171, 220 A.2d 558 (citation omitted). Both the Myers and appellant engaged in basic yard work and maintenance over the disputed area. Mr. Myers constructed the boat ramp in its entirety, and constructed the wooden bulkhead along the north side of the boat ramp, entirely within the disputed area, to prevent erosion of the land. After appellant purchased the property from the Myers, she constructed a privacy fence bordering the disputed area and a gate to prevent her dogs from using the boat ramp to enter the creek. She also repaired and extended the boat ramp by pouring additional concrete.

In *Blickenstaff*, 243 Md. 164, 220 A.2d 558, upon which appellant relies, the land in issue was a "small parcel" of "scrubby, brush land" adjacent to a farm. *Id.* at 166–69, 220 A.2d 558. The Blickenstaffs, who claimed title by adverse possession, "clear[ed] brush … cut[ ] bean poles … fell[ed]

large trees ... and ... plant[ed] and maintain[ed a] flower bed" on that property. *Id.* at 172, 220 A.2d 558. The circuit court did not find that they were entitled to the disputed land, based on adverse possession. The Court of Appeals reversed. *Id.* at 174, 220 A.2d 558. Noting that "there was never an assertion of ownership of the subject parcel by [title] owners," *id.* at 172, 220 A.2d 558, the Court concluded that the acts of the adverse possessors, "when the character and location of the small parcel are considered, were sufficient to comport with the ordinary management of similar lands by owners." *Id.* Therefore, it reversed the circuit court and held that the Blickenstaffs satisfied all the elements to obtain title by adverse possession. *Id.* at 174, 220 A.2d 558.

*Miceli v. Foley, supra,* 83 Md.App. 541, 575 A.2d 1249, also provides guidance. In that case, a landowner sued neighboring landowners who allegedly trespassed on the southwestern and northwestern boundaries of his property. *Id.* at 546, 575 A.2d 1249. The circuit court found that each of the neighbors had adversely possessed the respective land in dispute. *Id.* at 547, 575 A.2d 1249. As to the southwestern neighbor, the Court observed that the adverse possessor "consistently maintained and mowed the parcel up to the fence line," and "used the land to gather firewood and as a playground for [his] children." *Id.* at 556, 575 A.2d 1249. "Further," we said, "no evidence was produced that such uses are inconsistent with the nature of the residential property or with other uses in the neighborhood." *Id.* Therefore, we affirmed the circuit court's finding that the adverse possessor "assumed the requisite dominion and control over the property." *Id.* The Court also upheld the finding of actual possession with respect to the northwestern neighbors, who "added to the planting on the [disputed property] with ground cover and perennial flowers. They also maintained the greenery. The grass was mown, leaves raked, and plants pruned. Brambles and poison ivy were sprayed to prevent their encroachment onto the back yard." *Id.* at 562, 575 A.2d 1249.

In contrast, we upheld a finding that a putative adverse possessor did not have actual possession in *Barchowsky, su-*

*pra,* 105 Md.App. 228, 659 A.2d 347. There, the possessor made only "occasional use of the lane ... for walking, horse-back riding by her daughter, or picking up branches and chasing off trespassers...." *Id.* at 241, 659 A.2d 347.

*Peters v. Staubitz,* 64 Md.App. 639, 498 A.2d 661 (1985), is particularly persuasive, given its factual similarity to the case at bar. In that case, as here, a fence between two waterfront properties did not track the property line, leaving a small sliver of Peters's waterfront property on Staubitz's side of the fence. *Id.* at 641, 498 A.2d 661. Staubitz's use of the disputed land included construction of a "bulkhead" and a wooden "boat landing" at the river that bounded the land, as well as planting of trees and construction of a boathouse and fire pit. *Id.* at 645–46, 498 A.2d 661. We commented that "[t]he evidence amply supports" the court's finding that Staubitz actually possessed the portion of the disputed land containing these features. *Id.* at 646, 498 A.2d 661.

We find no support in any of our cases for the principle apparently adopted by the circuit court, i.e., that an adverse claimant's possessory acts might lose their possessory character if the acts also benefit the adjacent lands that the adverse claimant holds by title. The circuit court cited no authority for this proposition, nor do appellees. It would be a difficult rule to apply, particularly in cases such as this, in which adverse possession arises from a misplaced wall or fence, such that the disputed land and the land held by title are contiguous and are part of the same enclosure.

Indeed, the case law tends to support the opposite view: When an adverse claimant has used the disputed land in the same manner as adjacent land she owns by title, such acts are, if anything, *further* evidence of actual possession. For instance, in *East Washington Railway, supra,* 244 Md. at 295, 223 A.2d 599, the Court of Appeals said that "[t]he evidence clearly indicated that plaintiff" adversely possessed a strip of disputed property, because she had "lived on and farmed the property which included the strip of land in question for more than twenty years," and "[t]he strip was enclosed into the rest

of the farm by a fence which was continuously maintained ...
[and][t]he strip was used as a part of the farm."

Similarly, in *Miklasz v. G.W. Stone, Inc.*, 60 Md.App. 438,
483 A.2d 382 (1984), *cert. denied*, 302 Md. 570, 489 A.2d 1129
(1985), the Court found it "difficult to envision a more com-
plete appropriation of or possessory dominion over disputed
land," where the adverse claimant had performed a variety of
possessory acts, including "fill[ing] in a swamp that covered
approximately one acre of land, plant[ing] grass and shrubs in
the area which was used for recreational purposes ... [and
tearing] down two dilapidated small dwellings...." *Id.* at 444,
483 A.2d 382. "With respect to the filling and maintenance of
the swamp area," the trial court had said that the adverse
claimant's intent was "'to protect their property....'" *Id.*
Moreover, "[w]ith reference to the buildings which [the claim-
ant] tore down," the trial court had said that "'they did that
on their own as a gratuitous act, not with the intent of
obtaining title by adverse possession.'" *Id.* We rejected the
reasoning of the trial court.

In contrast, in *Goen v. Sansbury, supra*, 219 Md. 289, 149
A.2d 17, the Court determined that "there were no acts of
ownership for years after 1925," over a disputed area adjacent
to land that the adverse claimants held by title. *Id.* at 296,
149 A.2d 17. In that case, the Court recognized that "from
1925 to ... 1954, none of the [adverse claimants] even went on
the disputed area, and there [was] no doubt that after 1925 it
grew up in brush and that it was a completely wooded area at
the time of the trial and had been for many years before." *Id.*
at 295, 149 A.2d 17.

Based on the foregoing, we conclude that both the Myers
and appellant had actual, open, notorious, and exclusive use of
the disputed land in this case.

We next address the requirement of continuity. As noted,
under C.J. § 5–103, an adverse claimant must possess the land
continuously for the statutory period of twenty years. In this
context, we first attend to the issue of tacking.

When, as here, no single adverse possessor has held the property in question for the statutory twenty-year period, the court must consider whether successive periods of adverse possession may be tacked together to meet the requisite duration. Tacking will only be permitted where there is privity of estate between the successive adverse possessors. The Court explained in *Gore v. Hall, supra,* 206 Md. at 491, 112 A.2d 675:

It is unquestionable that where different persons enter upon land in succession without any privity of estate, the last possessor is not allowed to tack the possession of his predecessors to his own, so as to make out a continuity of possession sufficient to bar the entry of the owner. The reason for this rule is that the possession of the one is not that of the other, because the moment the first occupant quits possession, the constructive possession of the owner is restored, and the entry of the next occupant constitutes him a new disseisor. On the other hand, where there is privity of estate between the successive parties in possession, the possession of such parties may be tacked so as to make the twenty years required by the Statute of Limitations. The law is clear that such privity may be created by a sale and conveyance and possession under it as well as by descent.

Moreover, even where privity exists between successive possessors, it must be privity of estate *in the adversely possessed land.* Thus, "[g]enerally the rule is 'that possession cannot be tacked to make out title by prescription where the deed by which the last occupant claims title does not include the land in dispute.'" *White v. Pines Cmty. Improvement Ass'n,* 173 Md.App. 13, 48–49, 917 A.2d 1129 (2007) (quoting *Louis Sachs & Sons v. Ward,* 182 Md. 385, 394–95, 35 A.2d 161 (1943)), *aff'd in part, vacated in part on other grounds,* 403 Md. 13, 939 A.2d 165 (2008).

For tacking to apply, the land in dispute need not be included in the deed by which the last occupant claims title, "provided the land in question [is] contiguous to that described in a deed, and that lands both titled and untitled [are] part of

a close, apparent by reason of physical boundaries such as fences or hedges." *Mayor of New Market v. Armstrong,* 42 Md.App. 227, 242, 400 A.2d 425, *cert. denied,* 286 Md. 754 (1979). " '[T]wo possessions will be tacked if it appears that the adverse possessor actually turned over possession of that part as well as of that portion of the land expressly included in his deed.' " *Freed v. Cloverlea Citizens Ass'n,* 246 Md. 288, 304, 228 A.2d 421 (1967) (citation omitted; *Freed*'s emphasis omitted); *see also White,* 173 Md.App. at 49, 917 A.2d 1129; *Rosencrantz v. Shields, Inc.,* 28 Md.App. 379, 384–85, 346 A.2d 237, *cert. denied,* 276 Md. 749 (1975); *Zehner v. Fink,* 19 Md.App. 338, 346–47, 311 A.2d 477 (1973).

In *Freed,* 246 Md. 288, 228 A.2d 421, the Court quoted with approval from *Howind v. Scheben,* 233 Ky. 139, 25 S.W.2d 57 (1930), which, like the instant case, involved a dispute over "a small triangular parcel of land." *Freed,* 246 Md. at 302, 228 A.2d 421. The *Freed* Court said:

"The testimony shows that the fence now maintained has been there for more than 15 years and that it replaced a rail fence maintained on substantially the same location for forty years. The transfer of possession of a strip of land occupied by the grantor, although without title, which is inclosed with and used as part of the land described in the deed, is not affected by its omission from the description in the deed. In such cases the possession of the grantor and that of the grantee is continuous, and there is such privity of contract between them that the period of possession by each must be added in ascertaining the total period of adverse possession."

*Freed,* 246 Md. at 302, 228 A.2d 421 (quoting *Howind,* 25 S.W.2d at 58).

In this case, the Myers, appellant's predecessors in title to the Senez Property, held title for nineteen years and seven months—just shy of twenty years. Given that the Wall enclosed the disputed area within the Senez Property, and from the facts adduced at trial, we are satisfied that the

possession of the Myers, followed by the possession of appellant, satisfied the standards for tacking.

■ The question remains whether the Myers' and appellant's possession of the Senez Property was *continuous* for the requisite twenty-year period. Of import here, "[t]he running of the statutory period may be interrupted by the owner's entry on the land." *Miceli*, 83 Md.App. at 556, 575 A.2d 1249. This Court addressed the subject of reentry by a landowner extensively in *Rosencrantz, supra*, 28 Md.App. 379, 346 A.2d 237. It said:

> "All the authorities agree that an entry, to have [the] effect [of interrupting the statutory period], must be an actual entry upon some part of the land within the period of limitations, and **must evince that it is made with the clear and unequivocal intent to invade and challenge the right of the holder of the adverse possession and to retake possession.**"

> \* \* \*

> ... "[T]he running of the statute is interrupted by the owner's entry on the land, if, and only if, this is made openly and under claim of right, with a clearly indicated purpose of taking possession."

> \* \* \*

> ... "A mere physical entry by the owner is not enough, for, in order to defeat another's adverse possession, the owner's entry must clearly indicate to the occupant that his possession is invalid and his right challenged. It must be open and notorious and bear on its face an unequivocal intention to take possession, and must be made under such circumstances that, by the use of reasonable diligence, the occupant may ascertain the right and claim of the entrant. **The entry, it has been declared, must equal in dignity and character that required to initiate an adverse possession, that is, it cannot be accidental, casual, secret, or permissive.**"

> \* \* \*

"In all cases, however, the intent, as expressed, or evidenced by acts of ownership, is that which governs the effect of the entry. **The mere act of going upon the land is not enough. The owner must assert his claim to the land or perform some act that would reinstate him in possession, before he can regain what he has lost.** The conduct claimed by an owner to work an interruption of adverse possession must be such as would put an ordinary prudent person on notice that he actually has been ousted. Not every act by the owner on the land interrupts actual adverse possession."

*Id.* at 388–90, 346 A.2d 237 (emphasis added; citations omitted).

In this case, appellant describes the continuity of possession as follows:

During his 19 years, 7 months of residence, Mr. Myers believed the disputed property to be his and exercised dominion and control over that property such that his possession was actual and exclusive, without recognition of any other person as a record owner.... Upon the transfer of title to 341 to Appellant, Appellant immediately asserted her ownership of the disputed property by building a 48″ privacy fence along the existing Wall, the construction of which was not contested by Appellees. In or about July 2001, 20 years, 3 months after Mr. Myers took title to 341 and began the adverse possession of the disputed property, Appellees took up residence at 339. They subsequently made no assertion of ownership of the disputed property, including the boat ramp, despite Appellant's improving the boat ramp and installing a gate thereon.

Appellees vigorously dispute appellant's characterization of the facts. Indeed, they stake virtually their entire appellate argument on the proposition that, "during the period of Myers' ownership of 341 Worton Road, Appellees had entered on the land ... sufficient that, 'by using their property, [Appellees] were in possession of their property.' " Appellees assert: "Whether Appellees entered on the land and did so in

a sufficient manner to destroy Myers' assumed adverse possession of the disputed parcel will be the central question to be addressed as the Court considers the matter at bar."

Appellees reject appellant's "contention that because Appellees did not take up permanent residence at 339 Worton Road until after their house was finished (perhaps July or August of 2001), they could not have asserted dominion until that time or shortly thereafter." They rely on the circuit court's finding that appellees

> made frequent visits to 339 Worton for recreation, boating and supervision of demolition and construction. Further, there was persuasive testimony that [appellee] Ann Collins used the boat ramp before and after residing at 339 Worton. Use of the boat ramp without seeking permission by [appellant] was the equivalent of asserting an ownership interest or dominion over the property.

Further, appellees cite Ms. Collins's testimony that "when Mr. Myers was there it was much easier, we just jumped over the wall. We used it as a launch for our swimming. We had a canoe or, at least, some people brought a canoe out of the water all the time, the children, my friends, Shirley, we went swimming there." Moreover, they consider it significant that, according to Ms. Collins, appellees never asked permission of Mr. Myers, nor did Mr. Myers attempt to exclude them.

In addition, appellees rely on *Miceli, supra*, 83 Md.App. 541, 575 A.2d 1249. They quote it for the proposition that "a court will consider the character of the land and the purposes to which it is adapted" in determining "whether a particular use is sufficient to constitute dominion over the land...." *Id.* at 556, 575 A.2d 1249. Appellees ask, rhetorically: "Indeed, what could be more an assertion of dominion over a boat ramp than to openly launch a boat from it, swim from it, feed geese from it, and invite friends and family to do so as well?"

The circuit court agreed with appellees. It was of the view that, "[a]t the time [appellant] purchased her property, [appellees] had already used the boat ramp to launch canoes and to feed ducks. Thus, by using their property, [appellees] were in

possession of their property." Moreover, the court found that the Cooks used the boat ramp and, as a result, it did not "infer that Mr. and Mrs. Myers' possession of 341 and use of the property in dispute was adverse to the Cooks." The court concluded that appellees' "use of the area in dispute destroys the claimed 20 years period required for [appellant] to establish her adverse possession claim."

As we see it, the circuit court misapplied the relevant law. As we have noted, " '[t]he mere act of going upon the land is not enough. The owner must assert his claim to the land or perform some act that would reinstate him in possession, before he can regain what he has lost.' " *Rosencrantz*, 28 Md.App. at 390, 346 A.2d 237 (citation omitted). Thus, it was incorrect for the circuit court to conclude that any use of the property was equivalent to possession. Instead, "the owner's entry must clearly indicate to the occupant that his possession is invalid and his right challenged.... The entry, it has been declared, must equal in dignity and character that required to initiate an adverse possession...." *Id.* at 389, 346 A.2d 237.[16]

Appellees' actions of reentry did not rise to the level contemplated by the case law. In order to retake possession, an owner must engage in "[p]ossessory acts of dominion over [the] land...." *Miceli*, 83 Md.App. at 561, 575 A.2d 1249. As noted, " '[t]he standard to be applied to any particular tract of land is whether the possession comports with the ordinary management of similar lands by their owners....' " *Blickenstaff*, 243 Md. at 171, 220 A.2d 558 (citation omitted). Appellees' recreational use of the boat ramp has none of the characteristics of maintenance, upkeep, and improvement of land that Maryland courts have recognized as evincing possession. Rather, appellees' use of the boat ramp was more akin to the occasional, recreational horseback riding

---

**16.** Appellees tacitly acknowledge this principle by articulating *Miceli's* standard for actual possession by an adverse claimant as the standard that applies to their claim that they interrupted the statutory period by retaking possession.

that was held to be insufficient to establish possession in *Barchowsky, supra,* 105 Md.App. at 241, 659 A.2d 347. Moreover, appellees' conduct was unaccompanied by any clear indication of a purpose to retake the land. They did not interrupt the running of the statutory period.

Our conclusion accords with decisions from other jurisdictions. In *Otto v. Cornell,* 119 Wis.2d 4, 349 N.W.2d 703 (1984), as in this case, the parties were next door neighbors. For many years, *Otto* "maintained a fence on what he believed was the southern boundary of his lot and the northern boundary" of the Cornells' property. *Id.* at 705. He later removed the fence and replaced it with "four maple trees to mark the boundary," and thereafter maintained his property up to the trees for well over twenty years. *Id.* Thereafter, the Cornells discovered that the property line lay "between .7 feet and 7.2 feet north of the line on which Otto had planted the trees." *Id.* The Wisconsin appellate court upheld the trial court's finding that Otto had acquired the disputed area by adverse possession, despite the Cornells' alleged reentries on the land. *Id.* at 706. The Wisconsin court said, *id.* (emphasis added):

> The Cornells made no notorious reentry to dispossess Otto until after his adverse possession had been established.... *The trial court may ... have considered the Cornells' alleged activities, such as raking leaves and their children playing on the disputed strip, to be casual reentries.* It was not necessary for Otto to treat the disputed property more protectively than he treated [his own lot] to satisfy the requirement of exclusivity. He was not required to be belligerent if his neighbors happened to step across a particular line.

*Lilly v. Lynch,* 88 Wash.App. 306, 945 P.2d 727 (1997), presents a factual situation akin to the case at bar. It involved a dispute between adjoining landowners over ownership of a boat ramp that straddled the property line. *Id.* at 729. The *Lilly* court reviewed earlier Washington cases, including *Frolund v. Frankland,* 71 Wash.2d 812, 431 P.2d 188 (1967), *overruled on other grounds by Chaplin v. Sanders,* 100

Wash.2d 853, 676 P.2d 431 (1984). In *Frolund,* another factually similar case, the Washington Supreme Court said:

"[T]he evidence reveals that the children of the parties, as well as those of other neighbors, played about and over the various neighborhood beach areas with no more than the usual parental approval and restraint, and that the parties themselves occasionally, socially, and casually visited back and forth, and sometimes assisted one another in the performance of various work projects, e.g., beaching the swimming raft for winter storage. Such conduct, under the circumstances, denotes neighborliness and friendship. It does not amount to a subordination of defendants' adverse claim to the disputed wedge...."

*Lilly,* 945 P.2d at 732 (quoting *Frolund,* 431 P.2d at 192; *Lilly*'s emphasis omitted). As to the case before it, the *Lilly* Court recognized that "[u]ncontroverted evidence shows that [the title owner of the disputed area] regularly used the ramp...." *Lilly,* 945 P.2d at 733. But, the court concluded that this usage did not interrupt the adverse claimant's possession, reasoning that "it is likely a true owner would have allowed a friendly neighbor to use the ramp regularly without asking permission each and every time. As in *Frolund,* it is possible that this was the kind of use commonly allowed in the area, 'a neighborly accommodation' rather than 'shared occupancy.' " *Id.*

 Finally, we come to the third group of elements: Possession must be hostile, under claim of title or ownership. "Hostile" is a term of art in the law of adverse possession. As we recently explained in *Yourik, supra,* 174 Md.App. at 429, 921 A.2d 869:

Maryland courts have long recognized that the hostility necessary to make an occupancy or use adverse "does not necessarily import enmity or ill will." *See Hungerford,* 234 Md. at 340, 199 A.2d 209.

Rather, the term "hostile" signifies a possession that is adverse in the sense of it being "without license or permission," and "unaccompanied by any recognition of ... the

real owner's right to the land." *See id.* (citing 4 *Tiffany,* *supra,* § 1142); *Mavromoustakos v. Padussis,* 112 Md.App. 59, 65, 684 A.2d 51 (1996), *cert. denied,* 344 Md. 718, 690 A.2d 524 (1997). The type of "recognition of right" that destroys hostility is not mere acknowledgment or awareness that another claim of title to the property exists, but rather, *acceptance* that another has a *valid right* to the property, and the occupant possesses subordinately to that right.

*See also Blickenstaff,* 243 Md. at 174, 220 A.2d 558; *White,* 173 Md.App. at 49, 917 A.2d 1129.

 As noted, a claimant has the burden to prove title by adverse possession. *Costello,* 300 Md. at 67, 475 A.2d 1185. But, once a claimant has made a satisfactory showing as to open, continuous use for the statutory period, "[t]he burden then shifts to the landowner to show that the use was permissive." *Kirby v. Hook,* 347 Md. 380, 392, 701 A.2d 397 (1997); *see White,* 173 Md.App. at 49, 917 A.2d 1129; *Washington Land Co. v. Potomac Ridge Development Corp.,* 137 Md.App. 33, 58, 767 A.2d 891, *cert. denied sub nom. Hagerstown v. Wash. Land Co.,* 364 Md. 462, 773 A.2d 514 (2001). In *Yourik,* 174 Md.App. at 428–29, 921 A.2d 869, we said: "In establishing the hostility of a particular use, a showing that the use has been made ' "openly, continuously, and without explanation for twenty years," ' justifies a presumption that such use was adverse." (Citation omitted.)

 Moreover, in cases such as this, the existence of a visible boundary such as the Wall may be some evidence of adverse possession. The Court explained in *Rogers v. Burnopp,* 263 Md. 357, 363, 283 A.2d 367 (1971):

"[W]here the visible boundaries have existed for the period set forth in the Statute of Limitations, title will vest in the adverse possessor where there is evidence of unequivocal acts of ownership.... [I]t is immaterial that the holder supposed the visible boundary to be correct or, in other words, the fact that the possession was due to inadvertence, ignorance or mistake is entirely immaterial."

(Quoting *Tamburo v. Miller*, 203 Md. 329, 336, 100 A.2d 818 (1953)); *see Mauck*, 247 Md. at 441–42, 231 A.2d 685.

■ In *Costello v. Staubitz, supra*, 300 Md. 60, 475 A.2d 1185, the Court established general principles that a court must use in determining the evidentiary value of a "visible line of demarcation":

1) The existence of a visible line of demarcation ordinarily does not constitute evidence of adverse possession when:

a) it was created by a record owner, for the record owner's own purposes, within the record owner's land; or

b) it was created by a party claiming title by adverse possession for the purpose of claiming the visible line of demarcation as a boundary only if it is in fact coincident with the actual boundary.

2) The existence of a visible line of demarcation ordinarily constitutes some evidence of adverse possession when:

a) it was created by a party claiming title by adverse possession for the purpose of claiming the visible line of demarcation as a visible boundary delineating the extent of the claimed adverse possession; or

b) there is no evidence to show by whom and for what purpose the line of demarcation was created.

*Id.* at 73, 475 A.2d 1185 (internal citations omitted). And, as we have seen, "[i]n evaluating [an adverse possession] claim, the pertinent inquiry is whether the claimant has proved the elements 'based on the claimant's "objective manifestation" of adverse use, rather than on the claimant's subjective intent.'" *Porter*, 126 Md.App. at 276, 728 A.2d 755 (citations omitted).

Appellant contends that "the evidence offered in this case proves that neither Appellant nor her predecessor in title ever acknowledged that Appellees or their predecessors in title were record owners of the disputed property." Noting the circuit court's conclusion that "[t]here is no evidence in the record that there was any adversity or hostility" between the parties' respective predecessors in title, appellant maintains that the meaning of "hostile" in the adverse possession context "focuses upon the adverse possessor's treatment toward the

*land,*" and insists that this meaning "is contrary to [the circuit court's] erroneous focus on the cordial relationship between Mr. Cook and Mr. Myers." Indeed, appellees do not even address the issue of hostility in their brief.

The court reasoned:

> Myers' testimony is clear that he and the Cooks were friendly throughout the years they were neighbors. There is no evidence in the record that there was any adversity or hostility between them. Although no ill-will is required, there must be some proof. Myers believed when the wall was built, and then rebuilt, that it was on his property.... The neighbors were friendly, and cooperative.

The court's equation of "friendly," "cooperative" relations between the neighbors as evidence against hostility constitutes legal error as to the element of hostility. Moreover, the court's statement that "there must be some proof" suggests that the court misconceived the applicable burden, which had shifted to appellees to demonstrate that either the Myers' or appellant's use was merely permissive.

Furthermore, this case falls into category "2(b)" in the *Costello* criteria: There was no evidence as to who originally constructed the Wall, or for what purpose. The Wall was already in place when the Myers took possession of their property. Thus, the existence of the Wall itself was some evidence of adverse possession.

There was scant evidence in the record from which the court could have concluded that the use by appellant and Myers was *not* hostile to the owners of the Collins Property. In his deposition testimony, Mr. Myers described his use of the disputed area, by which he treated it as his own, maintaining and improving it, and giving permissive use of it to neighbors. In the main, appellant's conduct was equally indicative of possession hostile to appellees. But, there was testimony that, if believed, could be indicative of non-hostile possession: the disputed testimony of Ms. Collins, who testified that appellant asked her, before she built the privacy fence, "can my fence follow the wall instead of the property line?"

As we have seen, appellant denied asking this question,[17] and the court made no findings of fact to resolve whose version of the exchange was accurate. Nevertheless, it is undisputed that appellant subsequently proceeded to build the fence along the Wall, without permission from appellees.

To be sure, appellant's construction of the fence was a hostile, non-permissive use of the disputed area. But, given the fact-intensive nature of an adverse possession claim, findings of fact on the issue of whether appellant sought appellees' permission are important to the determination of whether appellant's possession was hostile. We elaborate.

Writing for this Court in *Yourik v. Mallonee, supra,* 174 Md.App. 415, 921 A.2d 869, Judge Adkins exhaustively addressed the meaning of the hostility requirement. As the *Yourik* Court explained, the requirement of hostility may be proved by showing, in the words of R.P. § 14–108(a), that possession was either "under color of title" or "under claim of right." There is no " 'hostile' circumstance that could not be adequately characterized by one of these two terms." *Yourik,* 174 Md.App. at 427, 921 A.2d 869.

As to the first term, " '[c]olor of title is that which in appearance is title, but which in reality is not good and sufficient title.' " *Id.* at 424, 921 A.2d 869 (citation omitted). "Under color of title" describes a situation in which a claimant bases a claim to land on an instrument that appears to give title—an instrument that, while actually defective in some manner, is " '*prima facie* good in appearance [so] as to be consistent with the idea of good faith on the party entering under it.' " *Id.* (citation omitted).

The case at bar does not concern a claim under color of title, and neither did *Yourik.* Rather, the bulk of the

17. Appellant recalled that she "mentioned" to appellees that her contractor had suggested placement of the fence "up on top of the [W]all," rather than alongside it, so as to "eliminate that small space between the fence and the [W]all." According to Senez, when appellees did not respond, affirmatively or negatively, she placed the fence along the Wall.

discussion in *Yourik* was devoted to answering "whether one who acknowledges that another holds a recorded deed to the disputed property may establish the requisite hostility 'under claim of right.'" *Id.* at 428, 921 A.2d 869. Such an occupancy falls into the category of a "claim of right," which means "that the occupancy rests on the claimant's demonstrated 'intention to appropriate and hold the land as owner, and to the exclusion, rightfully or wrongfully, of every one else.'" *Id.* at 428, 921 A.2d 869 (citation omitted).

In this regard, the *Yourik* Court explained, *id.* at 428–30, 921 A.2d 869 (emphasis in original):

> In establishing the hostility of a particular use, a showing that the use has been made "'openly, continuously, and without explanation for twenty years,'" justifies a presumption that such use was adverse.
>
> \* \* \*
>
> [T]he term "hostile" signifies a possession that is adverse in the sense of it being "without license or permission," and "unaccompanied by an recognition of . . . the real owner's right to the land." *See Hungerford v. Hungerford,* 234 Md. 338, 340, 199 A.2d 209 (1964) (citing 4 Herbert T. Tiffany & Basil Jones, TIFFANY ON REAL PROPERTY § 1142 (1975, through Sept. 2006)); *Mavromoustakos v. Padussis,* 112 Md.App. 59, 65, 684 A.2d 51 (1996), *cert. denied,* 344 Md. 718, 690 A.2d 524 (1997). The type of "recognition of right" that destroys hostility is not mere acknowledgment or awareness that another claim of title to the property exists, but rather *acceptance* that another has a *valid right* to the property, and the occupant possesses subordinately to that right.

The *Yourik* Court also quoted with approval from the *Restatement (First) of Property,* stating, 174 Md.App. at 440–41, 921 A.2d 881 (emphasis added and omitted):

> "To be adverse it is not essential that a use . . . be made either in the belief or under a claim that it is legally justified. *It is, however, necessary that the one making it shall not recognize in those as against whom it is claimed*

*to be adverse an authority either to prevent or to permit its continuance.* It is the non-recognition of such an authority at the time a use is made which determines whether it is adverse. . . . *A use which is not made in recognition of and in submission to a present authority to prevent it or to permit its continuance is adverse* though made in recognition of the wrongfulness of the use and, also, of the legal authority of another to prevent it."

In *Yourik*, the putative adverse possessor was a mother who "took over" her son's house after the son moved out of the house and defaulted on the mortgage. *Id.* at 418, 921 A.2d 869. For well over twenty years, the mother lived in or rented out the home, made mortgage payments until the debt was paid in full, and paid all taxes, utilities, and expenditures for upkeep. *Id.* Notably, the mother admitted that record title to the house remained in her son's name. *Id.* at 419, 921 A.2d 869.

The *Yourik* Court rejected the view that the mother's acknowledgment that her son held record title was fatal to her adverse possession claim. Instead, the determining factor was whether the mother " 'recognize[d] in [the son] an authority either to prevent or to permit [the] continuance' " of her possession. *Id.* at 430, 921 A.2d 869 (quoting *Restatement (First) of Property;* emphasis omitted). Judge Adkins explained: "The dispositive question that [the son] begs by declaring that [his mother's] acknowledgment equates to such recognition is whether she believed that [her son] could prevent her from occupying [the house], or that it was by [the son's] authority that she exercised ownership rights there." *Id.* at 432–33, 921 A.2d 869. The Court noted that "the trial court found that [the mother's] occupancy was not permissive, given that [she] did not 'ask [the son's] permission to do anything, because [she] didn't think [she] had to . . . .' " *Id.* at 433, 921 A.2d 869 (quoting trial court).

In this case, Ms. Collins's account of her conversation with appellant, if believed, may be seen as an acknowledgment by Senez of the Collins' superior right to the disputed area,

which would defeat the hostility required for adverse possession. On the other hand, appellant's version of the conversation (that she informed appellees but did not seek their permission to locate the fence on the Wall), coupled with her conduct in erecting the fence without appellees' permission, would not evince such an acknowledgment. Interpretation of the legal effect of such a conversation is contingent on the precise facts of the conversation.

On the record before us, there is a dispute of fact as to the nature of the conversation between appellant and appellees. Because the circuit court did not resolve the conflict, and instead resolved the question of hostility on a legally erroneous ground, we must vacate the judgment and remand to the circuit for further proceedings.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION. COSTS TO BE PAID 50% BY APPELLANT, 50% BY APPELLEES.**